UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x

                                       :

UNITED STATES OF AMERICA       :

                                         :

            - v. -           :                  20 Cr. 538 (PGG)

                                         :

DONNELL RUSSELL,           :
a/k/a "Colon Dunn,"         :
                  Defendant.    :

                                         :

------------------------------------------------------X

## THE GOVERNMENT'S MOTIONS *IN LIMINE*

 

DAMIAN WILLIAMS
United States Attorney
Southern District of New York
One St. Andrew's Plaza
New York, NY 10007

Peter J. Davis
Lara Pomerantz
Assistant United States Attorneys
    - Of Counsel -

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................. 1

RELEVANT FACTS ........................................................................................... 1

1.  The Defendant's Communications With His Co-Conspirators and Agents Leading Up to the Threat Call................................................................................. 2

2.  The Defendant Used a Fake Identity to Discourage Lifetime from Continuing with the Screening and to Intimidate Victims................................................ 4

3.  The Defendant Placed the Threat Call from the Russell Home......................... 4

4.  The 911 Call......................................................................................... 5

5.  The Defendant's Communications with His Co-Conspirators and Agents After the Threat Call ...................................................................................... 5

6.  CC-2's Communications with CC-1 after CC-1 Receives a Subpoena................ 7

7.  The Defendant's Public Statements About the Threat Call ............................ 8

ARGUMENT ................................................................................................... 9

I.  The 911 Call is Admissible.......................................................................... 9

   A.  The Court Should Admit a Recording of the 911 Call as a Present Sense Impression................................................................................... 9

      1.  Applicable Law ..................................................................... 9

      2.  Discussion ......................................................................... 10

   B.  The Court Should Admit a Recording of the 911 Call as an Excited Utterance......... 11

      1.  Applicable Law ................................................................... 11

      2.  Discussion ......................................................................... 12

   C.  The Court Should Admit a Recording of the 911 Call as a Prior Consistent Statement If the Defense Challenges the Employee's Credibility............................ 13

      1.  Applicable Law ................................................................... 13

      2.  Discussion ......................................................................... 15

II. The Defendant's Threats to Alleged Victims After the Screening are Admissible As Direct Evidence or Under Rule 404(b) .................................................... 16

   A.  Background ....................................................................... 16

  B. Applicable Law ................................................................................ 16

  C. Discussion ...................................................................................... 19

III. Statements by the Defendant's Co-Conspirator and Agent After the Threat Call Are Admissible ................................................................................ 21

  A. Background ..................................................................................... 21

  B. Applicable Law ............................................................................... 22

  C. Discussion ...................................................................................... 25

**CONCLUSION** ................................................................................................ **27**

## PRELIMINARY STATEMENT

The Government respectfully submits these motions *in limine* in advance of the trial of defendant Donnell Russell, a/k/a "Colon Dunn" (the "defendant"), scheduled to begin on July 18, 2022. As set forth below, the Government seeks pretrial rulings:

(1) allowing the introduction of the theater employee's 911 call after he received the threat call as a present sense impression, excited utterance, or, at a minimum, a prior consistent statement;

(2) allowing the introduction of evidence of the defendant's attempts to threaten participants in the docuseries "Surviving R. Kelly" after the December 4, 2018 screening, but before the public airing of the docuseries as direct evidence of the charged crimes or pursuant to Federal Rule of Evidence 404(b); and

(3) allowing the introduction of a statement of the defendant's co-conspirator and agent ("CC-2") under Federal Rule of Evidence 801(d)(2)(D) and (E).

## RELEVANT FACTS

On the evening of December 4, 2018, Lifetime Networks ("Lifetime"), a television network, held a private screening of the docuseries "Surviving R. Kelly" (the "Screening"). "Surviving R. Kelly" explored allegations that recording artist Robert Kelly, better known as R. Kelly, engaged in abusive sexual relationships with minor females and adult women. The Screening took place at a private theater in Manhattan (the "Theater"). After playing the docuseries, the Theater was set to host a panel discussion that would feature some of R. Kelly's alleged victims speaking about their experiences with R. Kelly.

The defendant was the CEO and President of Indybuild Corporation ("Indybuild") and was working on behalf of R. Kelly at the time of the Screening. The defendant and his co-conspirators

and agents worked together to stop the Screening from going forward. These efforts culminated in the defendant calling the Theater from a landline in his home address in Chicago, Illinois (the "Russell Home"). On that call, the defendant told a Theater employee (the "Employee") that someone in the Theater had a gun and was going to shoot up the place (the "Threat Call"). After receiving the Threat Call, the Employee called 911 (the "911 Call") and the Theater was evacuated.

### 1. The Defendant's Communications With His Co-Conspirators and Agents Leading Up to the Threat Call

During the relevant time period, R. Kelly was a client of the defendant and Indybuild. Before the Screening, the defendant worked with two co-conspirators and agents, CC-1 and CC-2, to stop the Screening from going forward.

CC-1 purported to be a publicist for one of R. Kelly's alleged victims who was attending the Screening. At the same time, CC-1 worked for the defendant to help stop Lifetime from continuing with the Screening and the national airing of the docuseries. CC-1 assisted the defendant and IndyBuild by, among other things, recording a voice message for Indybuild; recording conversations with the parent of one of R. Kelly's victims to discredit the parent; drafting materials for the defendant to send to Lifetime to discourage Lifetime from continuing with the Screening; and creating social media pages dedicated to discrediting R. Kelly's accusers.

Most significantly, CC-1 traveled to New York to provide the defendant with live updates on the Screening as it unfolded. In the days leading up to the Screening, CC-1 provided the defendant with the itinerary for the event. On December 3, 2018 (the day before the Screening), CC-1 provided contact information for executives at Lifetime and told the defendant, "I'm going to send the Lifetime info but I don't think it's best to send it to them anymore because that would mean one of us on the inside handed out their info. I thought about that." CC-1 further told the defendant to "create a profile and send them [*i.e.*, the Lifetime executives] all a DM [*i.e.*, a direct

message].”[1]

CC-1 and the defendant coordinated how CC-1 would report on the Screening. For example, CC-1 told the defendant that she was going try to attend a dinner with the alleged victims on the night before the Screening. The defendant told CC-1 to "Stay out of site [sic] if you're not invited . . . To [sic] risky . . . If you aren't allowed to go to meeting. We have to change the narrative of what takes place in the meeting." The defendant then reported this information to R. Kelly. In one text, for example, the defendant wrote R. Kelly, "Please keep the information I sent you quiet. There is a dinner scheduled for Monday [the night before the Screening] where they will be discussing how much everybody's getting paid . . . Our connect [*i.e.*, CC-1] will be at the dinner and she will be recording it for us." And, as discussed below, minutes before the defendant made the Threat Call, the defendant asked CC-1, "Are they continuing with the screening[?]" CC-1 told the defendant that the Screening was still going forward. The defendant then told CC-1 that the police would be arriving shortly and thereafter instructed CC-1 to delete those text messages.

CC-2, the defendant's mother, was in charge of Investor Relations at Indybuild. As with CC-1, CC-2 and the defendant drafted materials to discourage the Screening from going forward. Historical cellsite evidence will show that CC-2's cellphone was in the vicinity of the Russell Home when the defendant made the Threat Call. Additionally, as discussed below, after the defendant made the Threat Call, CC-2 advised the defendant how to inform R. Kelly about the Threat Call and advised the defendant to hide the identity of CC-1 from R. Kelly so that they did not get caught and could continue to make money from R. Kelly.

---

[1] As discussed below, on December 4, 2018, the defendant used an email account purporting to be "Colon Dunn" to email executives at Lifetime to discourage them from continuing with the docuseries.

### 2. The Defendant Used a Fake Identity to Discourage Lifetime from Continuing with the Screening and to Intimidate Victims

On the day of the Screening, the defendant created an email account under the name "Colon Dunn" and purported to be the "Lead Investigator" for R. Kelly. Using that email address, the defendant sent to representatives from A&E (the company that owns Lifetime) a PowerPoint presentation of allegedly derogatory information of the victims in the docuseries. The defendant forwarded this email to CC-1 with the email body "Here's what just went out!!!"

That same day, the defendant sent a Facebook message to one of R. Kelly's alleged victims, which stated, in substance and in part, "I've been retained by Mr. Kelly's advisers to investigate all the accusations that are threatening his career . . . we have convincing, litigate-able, incontrovertible evidence of the falsity of the allegations of the alleged Survivors and of their illegitimate criminal financial motives. And now we are gearing up to respond." The defendant forwarded a screenshot of this message to CC-1.

### 3. The Defendant Placed the Threat Call from the Russell Home

Throughout the day of the Screening, the defendant communicated with the Theater and attempted to convince the Theater to stop the Screening. Phone records from the Theater demonstrate that the defendant used multiple phone numbers to contact the Theater and stayed in constant communication with CC-1. After CC-1 confirmed that the Screening was going forward, the defendant made a number of calls to law enforcement affiliates near the Theater. For example, the defendant—using his cellphones which indicate that he was located near his home in Chicago—called two police precincts located near the Theater and one fire department affiliate located near the Theater. Before placing one of these calls, the defendant attempted to block his phone number. At approximately 7:37 p.m., the defendant placed the Threat Call from a landline in the Russell Home. Historical cellsite information shows that the defendant and CC-2 were in

proximity of the Russell Home around the time of the Threat Call. As discussed above, the Employee who received the Threat Call called 911 and the Theater was evacuated.

### 4. The 911 Call

At approximately 7:51 p.m. on December 4, 2018, after the Employee spoke with his supervisors, approximately 14 minutes after the Threat Call, the Employee called 911. On the 911 Call, the Employee reported, in substance and in part, that he received an anonymous call about an alleged shooter within the Theater (Ex. A at :34-58); in particular, he stated that the caller said that "someone had a gun at this event and that they would shoot up the place, quote un-quote." (*Id.* at 1:22-28).[2] The Employee stated that he was "very apprehensive about how to proceed." (*Id.* at 1:00-1:03). He clarified that nothing had yet happened, but they "were trying to prevent anything" from happening. (*Id.* at 1:37-40). The Employee stated that the call had been made "about 10 minutes ago, maybe less" and that he had "been acting as quick as I can about it." (*Id.* at 1:50-55). He explained that after the call, he "spoke with the security downstairs and then I got confirmation to call 911." (*Id.* at :47-50). The Employee noted that the Theater was a place of business with over 1,000 members and asked if they should evacuate the Theater. (*Id.* at 2:12-20). He also stated, "I'm sure you can understand my urgency to try and prevent anything." (*Id.* at 3:29-34).

### 5. The Defendant's Communications with His Co-Conspirators and Agents After the Threat Call

At approximately 7:36 p.m., the defendant texted CC-1, "The cops maybe [sic] arriving shortly." At approximately 8:05 p.m., the defendant texted CC-1, "Delete those messages about 50."[3] Later that evening, CC-2 texted the defendant, "Be humble when (if) you talk to Rob because

---

[2] The Government will transmit a copy of the 911 Call to the Court as Exhibit A.
[3] 50 is common shorthand for the police.

you made another move without checking with him first. Even though, it was for his benefit, he might not approve of your actions!!!" CC-2 further texted the defendant, "My calls were to tell not to mention the woman's name that is assisting you. Remember, someone in Rob's circle may be a mole, so give her an alias!!!"

The next day, CC-2 texted the defendant, "If there is no response then silence from you is an option, but the choice is yours to make!!!" Following this text, CC-1, CC-2, and the defendant drafted a statement about the threat to the Screening for R. Kelly to approve and release. The proposed statement read as follows:

> The incident which took place at the recent Lifetime screening was most unfortunate, and we empathize with anyone who was affected by it. However, Mr. Kelly is once again being targeted and accused of acts beyond his control. For months, we have watched as his name has been slandered, and women he once cared for deeply, as well as his family, have attempted to assassinate his character for their own financial gain. As Mr. Kelly's team, we have urged him to speak up, but due to his selfless nature, good moral character and out of the love and respect he's had for his family and these women; especially his ex-wife and mother of his children, he has not wanted to retaliate, but everyone has their limits. For the record, Mr. Kelly (The Artist) will NEVER be muted, and now, Robert S. Kelly (The Man) will no longer be silenced. The truth will be revealed. Times up.

CC-2 informed the defendant, "He [R. Kelly] had me forward the statement to him, so he can edit it. He's probably going to change the last sentence." CC-1 then emailed the defendant, "Did you get the statement approved or was it too much?" The defendant responded, "[R. Kelly] wants to change the last sentence… [R. Kelly] like everything else." The defendant then texted CC-1, "Damn, I see I got this one wrong," to which CC-1 responded, "Someone who's passionate about genuinely helping could never be the wrong, but I digress." At the same time of this conversation, CC-1 informed the defendant that CC-1 had "brought [sic] the survivingthelies.com

domain and made the IG [Instagram] page."[4]

In the days following the Threat Call, the defendant texted R. Kelly about receiving payments for Indybuild's work for R. Kelly. Specifically, the defendant texted R. Kelly, in substance and in part, "There's a lot that both me and [CC-2] need to accomplish for you and IndyBuild this week. I need funds to get them done." The defendant also tried to arrange a call between R. Kelly and investors in IndyBuild.

Further, in March 2019, the defendant and CC-1 worked together to create a competing documentary on R. Kelly's behalf. The defendant circulated an agenda for the meeting to CC-1. That agenda explained that "DR" [*i.e.*, Donnell Russell, the defendant] would be "paid a fixer/producing fee for facilitating access to this story" and that [CC-1] would "act as a credited writer/PR, reviewing questions and staff statements (prior to and during filming)."

### 6. CC-2's Communications with CC-1 after CC-1 Receives a Subpoena

On July 24, 2019, CC-1 emailed a copy of a Grand Jury subpoena dated July 24, 2019, that CC-1 received from the U.S Attorney's Office to CC-1's cousin ("Cousin-1"). Cousin-1 forwarded CC-1's email to the defendant on July 25, 2019. That same day, CC-2 sent Cousin-1 an email from her Indybuild email address (which Cousin-1 then forwarded to CC-1), which stated, in substance and in part, "I inserted your cousin's name and birth date in the Power of Attorney." The email from CC-2 included a number of attachments, including one attachment that stated, "There are No Criminal Laws in America," and another attachment which was a copy of the subpoena sent to CC-1 with the watermark "I DO NOT ACCEPT THIS OFFER TO CONTRACT AND I DO NOT CONSENT TO THESE PROCEEDINGS."

---

[4] "Surviving the lies" is a play on the docuseries "Surviving R. Kelly."

### 7. The Defendant's Public Statements About the Threat Call

After the Screening, the defendant gave a publicly available interview that was streamed on Youtube.com. The defendant stated, in substance and in part, that he wanted to clarify a rumor that R. Kelly was in jail because of the Threat Call. The defendant further stated, "Let me just clarify that, yes, there was a threat called in, I don't know who made the call." The defendant stated, "First of all, props to whoever did do that because they stopped it. At the initial screening there were so many dignitaries, they were trying to eliminate our ability to do joint ventures with other countries to get him some money. So if that event had taken place he probably would have been in the position where some of the concerts we had set up we never would have been able to accomplish. He didn't end up doing them because of course Lifetime repremiered it. But it would have been way more damage." The defendant further stated that he was the one who was sending cease and desist orders to the Theater and to Lifetime. The defendant said, "I called the venue, I was on the phone with them the whole day trying to get them not to air it because it was trademark infringement." The defendant then made clear that the Threat Call had "nothing to do with [R. Kelly]." The interviewer asked the defendant, "so there was a rumor saying that you did it and you wanted to clarify and say that it wasn't you." The defendant responded, "No, there is a rumor that's what is keeping [R. Kelly] from getting bail in New York, which is bullshit." In other words, the defendant did not want to clarify that he did not make the Threat Call, but wanted to clarify that the Threat Call was not responsible for keeping R. Kelly detained in jail.

**ARGUMENT**

### I. The 911 Call is Admissible

The 911 Call is admissible as a recording of the Employee's present sense impression and an excited utterance, and this Court should allow the Government to introduce the recording in its entirety. Alternatively, the 911 Call would also be admissible as a prior consistent statement under Federal Rule of Evidence 801(d)(1)(B) if the defendant attacks the Employee's credibility.

#### A. The Court Should Admit a Recording of the 911 Call as a Present Sense Impression

##### 1. Applicable Law

The Federal Rules of Evidence specifically make admissible, and exclude from the hearsay rule, present sense impressions—*i.e.*, statements "describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." Fed. R. Evid. 803(1). Such present sense impressions are "considered to be trustworthy because the contemporaneity of the event and its description limits the possibility for intentional deception or failure of memory." *United States v. Jones*, 299 F.3d 103, 112 (2d Cir. 2002). By the plain terms of the Rule, a statement may qualify as a present sense impression even if the declarant is not describing an event as it unfolds. "For statements to qualify as present sense impressions, precise contemporaneity is not required." *United States v. Ibanez*, 328 F. App'x 673, 675 (2d Cir. 2009); Fed. R. Evid. 803 advisory committee's note ("in many, if not most, instances precise contemporaneity is not possible and hence a slight lapse is allowable"). The declarant's availability is immaterial to whether the present sense exception applies. Fed. R. Evid. 803.

Not surprisingly given the foregoing, courts routinely admit as present sense impressions the audio recordings of 911 calls in which the callers report what they had observed during a recent incident. *See, e.g.*, *United States v. Vazquez*, 818 F. App'x 93, 95-96 (2d Cir. 2020) (911 call

9

admissible as both present sense impression and excited utterance); *United States v. Shoup*, 476 F.3d 38, 42 (1st Cir. 2007) (upholding admission of 911 call made minutes after the event); *United States v. Hawkins*, 59 F.3d 723, 730 (8th Cir. 1995), *vacated on other grounds*, 516 U.S. 1168 (1996) (upholding admission of statements from 911 tape as present sense impression, where call was placed at least seven minutes after the incident); *United States v. Steele*, 216 F. Supp. 3d 317, 322-23 (S.D.N.Y. 2016) ("A statement made during a 911 call within minutes of the caller's observation of the reported events is sufficiently contemporaneous to qualify as a present sense impression." (collecting cases)); *United States v. Scott*, No. 14 Cr. 494 (SAS), 2014 WL 6765960, at *1-2 (S.D.N.Y. Nov. 28, 2014) (admitting 911 call in which caller said an assailant "just pulled [a firearm] out on me" as the call was "obviously an effort to inform police about events that just transpired, so that they might address the situation"); *United States v. Lloyd*, 859 F. Supp. 2d 387, 395 (E.D.N.Y. 2012) (admitting 911 call as a present sense impression because "it described or explained the robbery immediately after the event by one who personally observed the event"); *United States v. Mejia-Valez*, 855 F. Supp. 607, 613-14 (E.D.N.Y. 1994) (admitting several 911 calls made after a shooting, including one call made at least 18 minutes later).

### 2. Discussion

It is clear from the 911 Call itself, including the content of the 911 Call, that the 911 Call was made 14 minutes after the Employee received the Threat Call. Indeed, the Employee stated that the Threat Call had been made "about 10 minutes ago, maybe less" and that he had "been acting as quick as I can about it." (Ex. A at 1:50-55). As set forth above, Rule 803(1) requires only that present sense impression be made "immediately thereafter" the event or condition described, and "precise contemporaneity is not required." *Ibanez*, 328 F. App'x at 675. Moreover, the 911 Call was "obviously an effort to inform police about events that just transpired, so that

they might address the situation." *Scott*, 2014 WL 6765960, at \*1-2. The Employee asked during the 911 Call if they should evacuate the Theater, noting his "urgency to try and prevent anything from happening." (Ex. A at 2:12-20, 3:29-34).

The 911 Call thus fits well within the present sense impression hearsay exception, and the Employee's statements are admissible for their truth. The Government respectfully requests that the recording of the 911 Call be admitted accordingly.

**B.      The Court Should Admit a Recording of the 911 Call as an Excited Utterance**

**1.   Applicable Law**

Under Rule 803(2) of the Federal Rules of Evidence, the normal bar on hearsay testimony does not apply to "a statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Excited utterances are admissible because such statements are made "under circumstances that eliminate the possibility of fabrication, coaching, or confabulation, and . . . therefore the circumstances surrounding the making of the statement provide sufficient assurance that the statement is trustworthy and . . . cross-examination would be superfluous." *Idaho v. Wright*, 497 U.S. 805, 820 (1990). In other words, "the excitement of the event limits the declarant's capacity to fabricate a statement and thereby offers some guarantee of its reliability." *United States v. Tocco*, 135 F.3d 116, 127 (2d Cir. 1998).

When a statement is offered as an excited utterance under Rule 803(2), its proponent must demonstrate three things. First, the proponent must establish that a startling event occurred. Second, the proponent must establish that the statement was made while the declarant was under the stress of excitement caused by the startling event. Third, the proponent must establish that the declarant's statement relates to the startling event. *United States v. Brown*, 254 F.3d 454, 458 (2d Cir. 2001).

"An excited utterance need not be contemporaneous with the startling event to be admissible under Rule 803(2)." *Tocco*, 135 F.3d at 127 (three hour delay); *see also United States v. Scarpa*, 913 F.2d 993, 1017 (2d Cir. 1990) (five or six hour delay); *Gross v. Greer*, 773 F.2d 116, 119-20 (7th Cir. 1985) (twelve hour delay). "Rather, the utterance must be contemporaneous with the excitement engendered by the startling event." *United States v. Joy*, 192 F.3d 761, 766 (7th Cir. 1999). Besides the lapse of time between the event and the statement, other relevant factors include: "the characteristics of the event; the subject matter of the statement; whether the statement was made in response to an inquiry; and the declarant's age, motive to lie and physical and mental condition." *United States v. Delvi*, 275 F. Supp. 2d 412, 415 (S.D.N.Y. 2003) (*citing United States v. Marrowbone*, 211 F.3d 452, 454-55 (8th Cir. 2000)). The fact that a declarant's statements were made in response to questioning rather than spontaneously is not dispositive. *See United States v. Glenn*, 473 F.2d 191, 194 (D.C. Cir. 1972); *United States v. Iron Shell*, 633 F.2d 77, 85-86 (8th Cir. 1980).

## 2. Discussion

The 911 Call fits within the excited utterance hearsay exception—that is, (1) there was a startling event (*i.e.*, the Threat Call); (2) the statements were made under the stress of that startling event; and (3) the Employee's statements during the 911 Call relate to the Threat Call. *See* Fed. R. Evid. 803(2); *see also Tocco*, 135 F.3d at 127. *First*, it is clear that the event at issue here was a startling one. The Employee reported that he received a call while working that "someone had a gun at this event and . . . they would shoot up the place, quote un-quote." (Ex. A at 1:22-28). *See, e.g.*, *John v. Masterson*, No. 08 Cr. 141 (TLM), 2010 WL 1957876, at *1 (D. Conn. May 14, 2010) (holding that statements made during 911 call as "an incident was escalating toward violence" were admissible as present sense impression and excited utterance); *United States v.*

*Harper*, No. 05 Cr. 6068L, 2009 WL 140125, at *2-3 (W.D.N.Y. Jan. 20, 2009) (same for statements during 911 call that defendant had just called and stated that he was coming with a gun to shoot the caller and her husband). Nor can there be any question that the Employee had personal knowledge of the startling event: his recorded statements themselves demonstrate that he was recounting a call that he had personally received while working.

*Second*, it is clear that the Employee was under stress when he made the 911 Call. Common understanding dictates that it is startling for someone to receive a call while at their place of employment that someone has a gun and is going to "shoot up" that very space. Indeed, during the 911 Call, the Employee stated that he was "very apprehensive about how to proceed" and he was "trying to prevent anything" from happening. (Ex. A at 1:00-1:03, 1:37-40). He also reiterated his "urgency to try and prevent anything" from happening. (*Id.* at 3:29-34). And although the Employee's tone appears calm in the 911 Call, "[t]hat the caller may have remained composed during the call does not prove that the caller was no longer in an excited state." *Steele*, 216 F. Supp. 3d at 323.

*Third*, and in a similar vein, there can be no serious dispute that the declarant's out-of-court statements (*i.e.,* the 911 Call) related to the startling event (*i.e.*, the Threat Call).

Accordingly, the Government respectfully submits that the 911 Call is admissible under the excited utterances exception to the hearsay rule.

### C. The Court Should Admit a Recording of the 911 Call as a Prior Consistent Statement If the Defense Challenges the Employee's Credibility

#### 1. Applicable Law

Under Rule 801(d)(1)(B) of the Federal Rules of Evidence, a prior statement is not hearsay if the declarant testifies and is subject to cross examination about the statement, the statement is consistent with the declarant's testimony, and the statement is offered either "(i) to rebut an express

or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying; or (ii) to rehabilitate the declarant's credibility as a witness when attacked on another ground." Notably, "the prior consistent statement need not be proffered through the testimony of the declarant but may be proffered through any witness who has firsthand knowledge of the statement." *United States v. Caracappa*, 614 F.3d 30, 39 (2d Cir. 2010) (affirming admission of prior consistent statements to rebut defense insinuation that witness had testified from improper motive).

Prior to 2014, a witness's prior consistent statement was only permitted to rebut a charge of recent fabrication that postdated the prior consistent statement. *See Tome v. United States*, 513 U.S. 150, 156 (1995). Many courts, however, including the Second Circuit, had developed rules allowing admission of prior consistent statements outside of the context of Rule 801(d)(1)(B) in order to rehabilitate a witness after certain attacks on credibility. *See, e.g.*, *United States v. Pierre*, 781 F.2d 329, 333 (2d Cir. 1986). In 2014, the Rule 801 was amended to allow prior consistent statements that were "otherwise admissible for rehabilitation" to come in "substantively as well." Fed R. Evid. 801 (Advisory Committee's Note to 2014 Amendment) ("The intent of the amendment is to extend substantive effect to consistent statements that rebut other attacks on a witness—such as the charges of inconsistency or faulty memory.").

Thus, as amended in 2014, Rule 801(d)(1)(B)(ii) "expands the purposes for which prior consistent statements may be offered." *United States v. Purcell*, 967 F.3d 159, 196 (2d Cir. 2020). The Second Circuit has relied on subsection (ii) of the amended Rule 801(d)(1)(B) in finding that the district court did not abuse its discretion in admitting prior consistent statements that were introduced to rebut "defendants' attacks on [the declarant's] credibility and memory," notwithstanding that the defendants' "challenges to [the declarant's] memory were brief and were

not their main challenges." *United States v. Flores*, 945 F.3d 687, 705-06 (2d Cir. 2019) (quoting Fed. R. Evid. 801 Advisory Committee Note (2014) for the proposition that "[t]he intent of the amendment [adding subpart (B)(ii)] is to *extend substantive effect* to consistent statements that rebut other attacks on a witness—such as the charges of inconsistency *or faulty memory*." (emphases in *Flores*)); *see also Purcell*, 967 F.3d at 196-98 (affirming admission of statements under Rule 801(d)(1)(B)(ii) where the declarant was accused of making inconsistent statements and defense counsel never suggested "that the accuracy of [declarant's] trial testimony was marred by recent fabrication or a recently created improper motive or influence"). Similarly, the Sixth Circuit has found that a district court properly admitted evidence of prior consistent statements that "rebutted [the d]efendant's attack on [the declarant's] purportedly faulty memory." *United States v. Cox*, 871 F.3d 479, 487 (6th Cir. 2017).

### 2. Discussion

The 911 Call would also be admissible as a prior consistent statement under Federal Rule of Evidence 801(d)(1)(B) if the defendant seeks to attack the Employee's credibility. The Government expects the Employee to testify about receiving the Threat Call, what was said during that call, and the steps he took upon receipt of the call, including placing the 911 Call. To the extent the defendant challenges the credibility of the Employee—whether in opening statements or on cross-examination—the Government intends to introduce a recording of the 911 Call as a prior consistent statement. *See, e.g.*, *Flores*, 945 F.3d at 705-06 (admitting prior consistent statement of witness after defense's opening statement called into question the witness's credibility); *United States v. Burrell*, 43 F. App'x 403, 406 (2d Cir. 2002) (allowing prior consistent statements of cooperating witness because the defendant "argued in her opening statement that the cooperating witnesses had a motive to lie").

The Government anticipates that the Employee will explain that during the Threat Call, the caller stated, in sum and substance, that someone had a gun in the Theater and was going to shoot up the place. During the 911 Call, made by the Employee only approximately 14 minutes after receiving the Threat Call, he stated that "someone had a gun at this event and that they would shoot up the place, quote un-quote." (Ex. A at 1:22-28). If the defense attacks the Employee's credibility on grounds such as inconsistency, mistake, or faulty memory, the Government is entitled to rehabilitate the Employee through his prior consistent statements. *See, e.g.*, *Purcell*, 967 F.3d at 197; *Flores*, 945 F.3d at 705-06; *Cox*, 871 F.3d at 487. A recording of the 911 Call is admissible under Rule 801(d)(1)(B).

## II. The Defendant's Threats to Alleged Victims After the Screening are Admissible As Direct Evidence or Under Rule 404(b)

### A. Background

The Government expects to offer evidence that in the days following the Threat Call, and leading up to the national televising of "Surviving R. Kelly" on January 3, 2019, the defendant continued to attempt to intimidate victims. For example, on December 21, 2018, the defendant used the Colon Dunn email account to send another alleged victim of R. Kelly an email with the subject "Your only warning!!!" and attached an exhibit that referred to the recipient as a "life long criminal who has been arrested and convicted of several crimes." And, on January 3, 2019, the defendant emailed another victim, instructing her to "Pull the plug . . . we have info on you and everyone. That will be good for you."

### B. Applicable Law

While the admissibility of uncharged or "other acts" evidence is generally governed by Federal Rule of Evidence 404(b), evidence of uncharged acts is admissible—without regard to Rule 404(b)—when it constitutes intrinsic or direct proof of the charged crimes. *See United States*

*v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000); *see also United States v. Diaz*, 176 F.3d 52, 79-80 (2d Cir. 1999) (evidence of "'uncharged acts may be admissible as direct evidence of the conspiracy itself.'" (quoting *United States v. Miller*, 116 F.3d 641, 682 (2d Cir. 1997)). Such evidence is admissible as direct evidence "if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." *Carboni*, 204 F.3d at 44 (internal quotation marks omitted) (quoting *United States v. Gonzalez*, 110 F.3d 936, 942 (2d Cir. 1997)). Evidence of other bad acts may similarly be admitted as direct evidence when it is offered to provide the jury with the complete story of the crimes charged, such as when the evidence demonstrates "the context of certain events relevant to the charged offense," *United States v. Inserra*, 34 F.3d 83, 89 (2d Cir. 1994), or the development of an illegal relationship between the defendant and his co-conspirators, *see Diaz*, 176 F.3d at 79 (quoting *United States v. Rosa*, 11 F.3d 315, 334 (2d Cir. 1993)).[5]

Where Rule 404(b) does apply, the Second Circuit "has adopted an 'inclusionary' approach to other act evidence under Rule 404(b)," *United States v. LaFlam*, 369 F.3d 153, 156 (2d Cir. 2004); *see also United States v. Curley*, 639 F.3d 50, 56 (2d Cir. 2011), under which "'evidence of prior crimes, wrongs, or acts is admissible for any purpose other than to show a defendant's criminal propensity,' as long as it is 'relevant to some disputed issue in the trial' and satisfies the

---

[5] There is an inconsistency in the case law as to whether evidence offered to establish the nature of the relationship among co-conspirators should be treated as direct evidence or admissible other act evidence under Rule 404(b). *Compare Diaz*, 176 F.3d at 79 (treating such evidence as direct evidence) *with Rosa*, 11 F.3d at 333 (treating such evidence as admissible pursuant to Rule 404(b)). The Government does not object to the Court instructing the jury (as it would be required to do upon defense request under Rule 404(b)) about the limited purposes for which the evidence is being offered.

probative-prejudice balancing test of Fed. R. Evid. 403." *United States v. Brennan*, 798 F.2d 581, 589 (2d Cir. 1986) (citations omitted).

In determining whether such evidence is properly admissible, courts thus consider whether the evidence is "offered for a proper purpose" and "relevant to a material issue in dispute," and whether "its probative value is substantially outweighed by its prejudicial effect." *LaFlam*, 369 F.3d at 156; *see also United States v. Ortiz*, 857 F.2d 900, 903 (2d Cir. 1988). "[P]roper purpose[s]" include "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). The Second Circuit has similarly found, as "legitimate purpose[s] for presenting evidence of extrinsic acts," evidence offered to "explain how a criminal relationship developed" or to "help the jury understand the basis for the co-conspirators' relationship of mutual trust." *United States v. Pipola*, 83 F.3d 556, 566 (2d Cir. 1996). Similarly, the Second Circuit has held repeatedly that corroboration of Government witnesses is an appropriate, non-propensity purpose for admitting "other acts" evidence. *See, e.g., United States v. Everett*, 825 F.2d 658, 660-61 (2d Cir. 1987) ("Under Rule 404(b) evidence of 'other crimes' has been consistently held admissible to corroborate crucial prosecution testimony.") (citations omitted); *United States v. Williams*, 577 F.2d 188, 192 (2d Cir. 1978) (holding that other acts evidence is admissible "for corroboration purposes, provided that the corroboration is direct and the matter corroborated is significant").

Finally, while any evidence offered pursuant to Rule 404(b) is subject to the balancing test set forth in Rule 403, the Second Circuit has long made clear that "other act" evidence that is neither "more sensational" nor "more disturbing" than the charged crimes will not be deemed unfairly prejudicial. *United States v. Roldan Zapata*, 916 F.2d 795, 804 (2d Cir. 1990); *United States v. Williams*, 205 F.3d 23, 33-34 (2d Cir. 2000); *see also United States v. Paulino*, 445 F.3d

211, 223 (2d Cir. 2006); *cf. Constantino v. Herzog*, 203 F.3d 164, 174 (2d Cir. 2000) ("Because virtually all evidence is prejudicial to one party or another, to justify exclusion under Rule 403 the prejudice must be unfair.").

### C. Discussion

The Court should admit the defendant's threats after the Screening as direct evidence or under Rule 404(b). The defendant's threats to the participants in "Surviving R. Kelly" after the Screening, but before its public airing on January 3, 2019 are inextricably intertwined with the charged offenses that were committed by the defendant.[6] These threats are therefore not "other acts" evidence under Rule 404(b), but rather direct evidence of the charged crimes. *See, e.g.*, *United States v. Quinones*, 511 F.3d 289, 308-09 (2d Cir. 2007) (noting that "evidence of uncharged criminal conduct is not evidence of 'other crimes, wrongs, or acts' under Rule 404(b) if that conduct is 'inextricably intertwined with the evidence regarding the charged offense'") (quoting *United States v. Towne*, 870 F.2d 880, 886 (2d Cir. 1989)); *Carboni*, 204 F.3d at 44 (holding that evidence of uncharged crime is admissible as direct evidence of conspiracy "if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial" (internal quotation marks omitted)); *Gonzalez*, 110 F.3d at 942 (upholding admission of other crimes evidence as "crucial background evidence that gave coherence to the basic sequence" of the charged crime). The continued threats by the defendant after the Screening explains the relationship between the defendant and R. Kelly and is part of the same pattern of intertwined efforts to stop the Screening and docuseries from proceeding.

---

[6] As noted above, the defendant also made significant efforts to intimidate victims on December 4, 2018, prior to the Screening. Those threats are direct evidence of the defendant's intent in the lead up to the Threat Call.

The defendant's threats after the Screening are also direct evidence of the defendant's motive, intent, and identity under Rule 404(b). The Government anticipates that the defense will argue that the defendant did not make the Threat Call, or, in the alternative, that he did not intend to communicate a threat to the Theater. The defendant's subsequent threats to participants in the docuseries directly rebut these arguments because they demonstrate the defendant's motivation to make the Threat Call (to stop the docuseries from being played at the Theater and the victims attending the Screening from speaking); his identity as the person who made the Threat Call (he used the same threat tactic on December 21, 2018 and January 3, 2019 to stop the national airing that he did on December 4, 2018 to successfully stop the private Screening); and his intent because the express nature of the December 21, 2018 and January 3, 2019 threats rebuts any idea that the defendant did not have the intent to communicate a threat one month earlier when he made the Threat Call.[7]

More specifically, the defendant's motivation for making the Threat Call was to stop the Screening from proceeding. On December 4, 2018, he succeeded in those efforts. The defendant doubled down on these efforts when he repeatedly contacted a victim and directly threatened to expose "information" on her in an attempt to stop the docuseries from being nationally televised on January 3, 2019; accordingly, his actions after December 4, 2018 arise from the same motivation that drove him to make the Threat Call.

---

[7] The defendant's threats to the victims on December 21, 2018 and January 3, 2019 are not more inflammatory than the charged crime. The defendant is charged with calling a theater crowded with people and stating that there was person with a gun who was going to shoot up the place. The defendant's efforts to intimidate victims by threatening to expose information is less inflammatory. Accordingly, the clear probative value of the December 21, 2018 and January 3, 2019 threats are not outweighed by any potential for unfair prejudice.

In short, the December 21, 2018 and January 3, 2019 threats were a continuation of the Threat Call made on December 4, 2018 and, therefore, introducing the December 21, 2018 and January 3, 2019 threats are proper as direct evidence of the charged crimes, or to show intent, motive, and identity under Rule 404(b). *See, e.g.*, *United States v. Saint Clair*, No. 19 Cr. 790 (PKC), 2022 WL 2256236, at *5-7 (S.D.N.Y. June 23, 2022) (Rule 404(b) evidence properly admitted as "proof of intent.").

### III. Statements by the Defendant's Co-Conspirator and Agent After the Threat Call Are Admissible

#### A. Background

Hours after the Threat Call, CC-2 texted the defendant, "Be humble when (if) you talk to Rob because you made another move without checking with him first. Even though, it was for his benefit, he might not approve of your actions!!!" CC-2 further texted the defendant, "My calls were to tell not to mention the woman's name that is assisting you. Remember, someone in Rob's circle may be a mole, so give her an alias!!!" The next day, CC-2 texted the defendant, "If there is no response then silence from you is an option, but the choice is yours to make!!!" Following this text CC-1, CC-2, and the defendant worked on a statement about the threat to the Screening for R. Kelly to approve and release.

These statements made by CC-2 are admissible as statements of the defendant's co-conspirator in furtherance of the conspiracy under Federal Rule of Evidence 801(d)(2)(E), and as statements of an agent and employee of the defendant while acting within the scope of that agency relationship under Federal Rule of Evidence 801(d)(2)(D).[8]

---

[8] The Government anticipates offering statements in the form of questions, directions, or other statements not offered for their truth, as uttered by the defendant, co-conspirators, and/or agents and employees of the defendant. These statements are, by definition, not hearsay. *See Paulino*, 445 F.3d at 216-17 ("It has long been the rule that so long as statements are not presented for the

### B. Applicable Law

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted" and generally is not admissible unless it falls within one of the exclusions or exceptions to the rule against the admissibility of hearsay. *See* Fed. R. Evid. 801(c), 802. One such exclusion is that an out of court statement made by a defendant, and offered by the Government against the defendant, is not hearsay and admissible as a party admission. *See* Fed. R. Evid. 801(d)(2)(A).

Likewise, Rule 801(d)(2)(D) of the Federal Rules of Evidence allows for the introduction of statements if "offered against an opposing party" and "made by the party's agent or employee on a matter within the scope of that relationship and while it existed." To admit a statement under this rule, the court must find "(1) the existence of the agency relationship, (2) that the statement was made during the course of the relationship, and (3) that it relates to a matter within the scope of the agency." *Feis v. United States*, 394 F. App'x 797, 799 (2d Cir. 2010) (quoting *Pappas v. Middle Earth Condo. Ass'n*, 963 F.2d 534, 537 (2d Cir. 1992)). As the Second Circuit has explained, "admissibility under this rule should be granted freely," and there is a "liberal" standard for admissibility rooted in the understanding that agents and employees are usually the people "best informed about certain acts committed in the course of [their] employment." *Pappas*, 963 F.2d at 537. Applying this rule, courts have found a wide range of agent and employee statements admissible. *See, e.g., United States v. Kelley*, 305 F. App'x 705, 708 (2d Cir. 2009) (forms signed by one business partner in the course of business admissible against another partner); *In re Reserve Fund Sec. & Derivative Litig*, No. 09 Civ. 4346 (PGG), 2012 WL 12354233, at *7-8 (S.D.N.Y. Oct. 3, 2012) (statements made by an employee of an entity are admissible when offered against

---

truth of the matter asserted, but only to establish a context, the defendant's Sixth Amendment rights are not transgressed." (internal quotation marks, brackets, and ellipses omitted)).

the person who controls the entity).

Further, Rule 801(d)(2)(E) of the Federal Rules of Evidence provides in relevant part that "[a] statement is not hearsay if . . . the statement is offered against an opposing party and was made by the party's co-conspirator during and in furtherance of the conspiracy." To admit a statement under this rule, a district court must find two facts by a preponderance of the evidence: first, that a conspiracy that included the defendant and the declarant existed; and, second, that the statement was made during the course and in furtherance of that conspiracy. *Bourjaily v. United States*, 483 U.S. 171, 175 (1987); *United States v. Gigante*, 166 F.3d 75, 82 (2d Cir. 1999).

Under this exception to the hearsay rule, "[t]he conspiracy between the declarant and the defendant need not be identical to any conspiracy that is specifically charged in the indictment" or that is the subject of the relevant trial. *Gigante*, 166 F.3d at 82. "In fact, the Second Circuit has held that it is not even necessary that the Government charge a conspiracy to take advantage of Rule 801(d)(2)(E)." *United States v. Ulbricht*, 79 F. Supp. 3d 466, 483-84 (S.D.N.Y. 2015) (citing *United States v. DeVillio*, 983 F.2d 1185, 1193 (2d Cir. 1993)); *see also United States v. Maldonado-Rivera*, 922 F.2d 934, 962 (2d Cir. 1990) ("Though . . . Fed. R. Evid. 801(d)(2)(E) requires proof that both the declarant and the party against whom a declaration is offered be members of the same conspiracy, it does not require that the conspiracy be one charged in the indictment"). Moreover, when determining whether the predicate conspiracy has been established, the district court is not bound by the rules of evidence, *see* Fed. R. Evid. 104(a), and "the district court may consider the hearsay statement itself" as evidence of "the existence of a conspiracy." *United States v. Padilla*, 203 F.3d 156, 161 (2d Cir. 2000) (citing *Bourjaily v. United States*, 483 U.S. 171, 181 (1987)).

To be in furtherance of a conspiracy, a statement "must in some way have been designed to promote or facilitate achievement of a goal of the ongoing conspiracy." *United States v. Rivera*, 22 F.3d 430, 436 (2d Cir. 1994). Under this standard, a co-conspirator statement is admissible if it "reasonably [can] be interpreted as encouraging a co-conspirator or other person to advance the conspiracy, or as enhancing a co-conspirator or other person's usefulness to the conspiracy." *United States v. Tarantino*, 846 F.2d 1384, 1412 (D.C. Cir. 1988). Thus, statements are in furtherance of the conspiracy if they: (1) inform or provide an update as to the status or progress of the conspiracy, *see United States v. Desena*, 260 F.3d 150, 158 (2d Cir. 2001); (2) "prompt the listener . . . to respond in a way that promotes or facilitates the carrying out of a criminal activity," *Maldonado-Rivera*, 922 F.2d at 958; (3) "seek to induce a co-conspirator's assistance," *Desena*, 260 F.3d at 158 (internal quotations omitted); (4) "provide reassurance," *id.*; (5) "serve to foster trust and cohesiveness," *id.*; *United States v. Simmons*, 923 F.2d 934, 945 (2d Cir. 1991); (6) "facilitate and protect" the conspiratorial activities, *United States v. Diaz*, 176 F.3d 52, 87 (2d Cir. 1999); or (7) inform a co-conspirator of "the identity and activities of his coconspirators," *United States v. Rastelli*, 870 F.2d 822, 837 (2d Cir. 1989); *United States v. Rahme*, 813 F.2d 31, 36 (2d Cir. 1987). A narrative description of a past event is admissible as long as it serves "some current purpose in the conspiracy." *United States v. Thai*, 29 F.3d at 813; *see also Desena*, 260 F.3d at 159; *Maldonado-Rivera*, 922 F.2d at 958; *United States v. Flaharty*, 295 F.3d 182, 199-200 (2d Cir. 2002).

Indeed, "[s]tatements that describe past events are in furtherance of the conspiracy if they are made . . . simply to keep coconspirators abreast of current developments and problems facing the group." *United States v. Jefferson*, 215 F.3d 820, 824 (8th Cir. 2000) (internal quotations omitted). For example, in *United States v. Lozano-Reyes*, the Second Circuit affirmed the trial

court's admission of co-conspirator statements relating to past events because the statements served a current purpose in the conspiracy, namely, "to engender trust, to increase [the witness's] familiarity with the conspiracy's *modus operandi*, and to outline future conspiratorial actions and the anticipated profits." *United States v. Lozano-Reyes*, 101 F.3d 686 (2d Cir. 1996).

## C. Discussion

At trial, the Government intends to introduce text messages that CC-2 sent the defendant in the hours following the Threat Call. These statements should be admitted under Rule 801(d)(2)(D) and (E). *See Rivera*, 22 F.4d at 436.

*First*, CC-2's texts to the defendant are admissible as co-conspirator statements admissible under Rule 801(d)(2)(E).[9] As discussed above, CC-2 assisted the defendant's efforts to stop the Screening on December 4, 2018, including by drafting materials to send to Lifetime to discourage them from proceeding. And, historical cellsite information from CC-2's phone shows that it was in the vicinity of the Russell Home at the time of the Threat Call. In the statements described above, CC-2 advised the defendant how best to protect the conspiracy after the Threat Call. These statements demonstrate both CC-2's knowledge and participation in the conspiracy. Specifically, CC-2 instructs the defendant to "[b]e humble" when telling R. Kelly about the Threat Call because "he might not approve of [the defendant's actions]." Additionally, CC-2 instructs the defendant "not to mention the women's [*i.e.*, CC-1] name who is assisting [the defendant]" because there could be a "mole" in R. Kelly's circle. In these communications, CC-2 instructed the defendant on how to best protect the conspiracy after the Threat Call because if the defendant revealed too much to R. Kelly about the Threat Call or about CC-1, they would be exposed by the alleged

---

[9] To the extent these communications include statements of the defendant, they are admissible as party admissions under Rule 801(d)(2)(A).

"mole" in R. Kelly's circle. CC-2's statements are therefore admissible because they are made to "facilitate and protect" conspiratorial activities." *Rastelli*, 870 F.2d at 837.

*Second*, CC-2's statements are also admissible as statements made within the scope of CC-2's agency relationship with the defendant. CC-2 was employed at the defendant's company Indybuild. Indeed, before and after the Threat Call, the defendant sought payment from R. Kelly for services that the defendant and CC-2 provided to R. Kelly. CC-2 sent the above messages in the scope of her agency relationship with the defendant: CC-2 advised the defendant how to inform R. Kelly of the Threat Call and how to manage the publicity that came from shutting down the Screening. CC-2 encouraged the defendant to have a response to the fallout from the Threat Call, and CC-2's communications with the defendant make clear that she subsequently sent the draft statement to R. Kelly for comment.

Indeed, after CC-2, CC-1, and the defendant drafted the statement about the Threat Call, CC-2 texted the defendant, "[m]y moves forward were thought out, so not to jeopardize the portion of the funds for administrative and logistics due IndyBuild from the contract for Europe." And, the defendant continued to seek payment for CC-2 and IndyBuild after the Threat Call. Specifically, the defendant texted R. Kelly, in substance and in part, "[t]here's a lot that both me and [CC-2] need to accomplish for you and IndyBuild this week. I need funds to get them done." The statements are therefore also admissible as statements "by the party's agent or employee on a matter within the scope of that relationship" under Rule 801(d)(2)(D); *see also United States v. Rioux*, 97 F.3d 658, 660 (2d Cir. 1996) (statements of declarants admissible against defendant where they were hired by defendant, served at his pleasure, and received instruction from him).

Accordingly, CC-2's statements after the Threat Call are admissible.

**CONCLUSION**

For all of the foregoing reasons, the Government respectfully submits that the Court grant

the Government's motion in its entirety.

Dated:  New York, New York
         June 27, 2022

                                    Respectfully submitted,

                                    DAMIAN WILLIAMS
                                    United States Attorney for the
                                    Southern District of New York


                           By:    _s/_____
                                    Peter J. Davis / Lara Pomerantz
                                    Assistant United States Attorneys
                                    (212) 637-2468