UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x
: 
UNITED STATES OF AMERICA           :
:
- v. -                    :                    20 Cr. 538 (PGG)
:
DONNELL RUSSELL,                    :
a/k/a "Colon Dunn,"                 :
                    Defendant.      :
:
:
------------------------------------------------------X

## THE GOVERNMENT'S MEMORANDUM IN OPPOSITION TO THE DEFENDANT'S MOTIONS *IN LIMINE*

DAMIAN WILLIAMS
United States Attorney
Southern District of New York
One St. Andrew's Plaza
New York, NY 10007

Peter J. Davis
Lara Pomerantz
Assistant United States Attorneys
        - Of Counsel -

## TABLE OF CONTENTS

PRELIMINARY STATEMENT……………………………………..…………………1

ARGUMENT…………….....………………………………………….…………….....2

I.     There is No Basis to Preclude Expert Testimony on Historical Cell Site Data………………………………………………………….……………..2

        A.  Applicable Law………..………………………………………….…..2

        B.  Discussion …….……………………………………………………...3

           1.   The Government's Notice is More Than Sufficient..………………………………………..……………...3

           2.   Mr. Petersohn's Anticipated Testimony Satisfies the Liberal Requirements of Rule 702………………………………………………..…….……4

           3.   Mr. Petersohn's Expected Testimony Is Admissible under Rule 403…..……………………………………………………..…7

II.     The Defendant May Be Cross-Examined About His February 2018 Gun Threat……………………………………………………………………......8

        A.  Applicable Law…………………………………………..……….…9

        B.  Discussion………………...……………………………….….…9

III.    The Employee Should Be Permitted to Testify to his Understanding that the Threat Call Contained a Threat………………………………………………..…...11

        A.  Applicable Law……………………...……………………….....12

        B.  Discussion……………………...………………………...……………12

IV.    The Court Should Deny the Defendant's Request for Written Juror Questionnaires………..……………………………………………………....15

        A.  Applicable Law…………...……………………………………16

        B.  Discussion……..………………………………………………16

V.     The Defendant's Generic Relevance Arguments Fail…………..……………….......20

A. Background...…..……………………………………………………..20

B. Applicable Law……………...……………………………………….21

C. Discussion……………..…………………………………………..21

**CONCLUSION…………...……………………………………………………25**

**PRELIMINARY STATEMENT**

The Government respectfully submits this memorandum in opposition to defendant Donnell Russell's motions *in limine*, dated June 27, 2022.  For the reasons that follow, the defendant's motions should be denied.  *First*, there is no basis to preclude the Government's expert on historical cell site data.  *Second*, if the defendant elects to testify, the Government should be permitted to cross-examine the defendant about a similar gun threat he made months earlier when he wanted to stop someone from reporting a domestic violence allegation against him.  *Third*, the defendant's motion for a jury questionnaire should be denied as a questionnaire will needlessly prolong and delay the jury selection process, and the Court will take appropriate measures to safeguard the defendant's right to a fair and impartial jury by conducting a proper *voir dire*. *Fourth*, the Court should reject the defendant's motion to preclude the Employee from referring to the Threat Call as a "threat" and his related motion to exclude the recording of the 911 Call during which the Employee referred to the Threat Call as a "threat"; the relief sought by the defendant is unsupported by the law.  *Fifth*, and finally, the Court should reject the defendant's motion to preclude certain evidence, including the defendant's own public admissions, as such evidence is highly probative of the defendant's guilt and the defendant has not identified any possible unfair prejudice.

1

**ARGUMENT**

**I.   There is No Basis to Preclude Expert Testimony on Historical Cell Site Data**

The defendant moves to preclude the Government's expert on historical cell site data, Andrew Petersohn.  The Government expects Mr. Petersohn to testify regarding the location of the defendant's cellphones and his co-conspirators' cellphones (the "Subject Devices") during the time leading up to and during the Threat Call.

The defendant does not contest Mr. Petersohn's qualifications as an expert.  Instead, the defendant asserts that the Government's expert notice (the "Expert Notice") was insufficient; testimony concerning the likely approximate locations of the Subject Devices does not require specialized training or expertise and, therefore, cannot be offered by an expert; and such testimony is not relevant.  (Dkt. No. 48).  As set forth below, the defendant's arguments are not supported by the law or facts, are contrary to Second Circuit guidance, and are otherwise unpersuasive.  The defendant's motion should be denied.

**A.  Applicable Law**

Under Federal Rule of Evidence 702, the Court may admit "[a] witness who is qualified as an expert . . . if: (a) the expert's scientific . . . knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702; *see also Daubert v. Merrell Dow*, 509 U.S. 579, 592-93 (1993) (explaining that the district court must assess "whether the reasoning or methodology underlying the [expert's] testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue").

Lay opinion testimony, on the other hand, is governed by Federal Rule of Evidence 701, which provides that such testimony must be: "(a) rationally based on the witness's perception; (b)

2

helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." The Advisory Committee's Note on Rule 701 instructs that opinion testimony under Rule 701 must be limited to opinions that "result from a process of reasoning familiar in everyday life." *United States v. Cuti*, 720 F.3d 453, 459 (2d Cir. 2013) (quoting Fed. R. Evid. 701 advisory committee's note, 2000 amend.).

### B. Discussion

#### 1. The Government's Notice is More Than Sufficient

As described in the Government's Expert Notice, Mr. Petersohn is a licensed Professional Engineer in the states of Delaware, Florida, Maryland, New Jersey, New York, Pennsylvania, and Virginia, and the Principal Engineer at dBm Engineering.  Mr. Petersohn holds a Bachelor of Science and Master of Engineering from Lehigh University.  Since 1997, Mr. Petersohn has worked as an employee or contractor for multiple cellular service providers including T-Mobile, Verizon, AT&T, Nextel (subsequently purchased by Sprint), and Bell Atlantic.  Mr. Petersohn has experience designing and testing cellular networks, including through drive tests and performance analysis tests to determine coverage areas of cell sites.  Mr. Petersohn's testimony is based on his education, training, and experience; his review of information about T-Mobile and Verizon cell sites in Chicago, Illinois and New York on December 4, 2018; and review of the geography, topography, and environmental and man-made factors that might affect the functioning of cell sites in Chicago and New York.  (Dkt. No. 48-1).

In addition to describing Mr. Petersohn's qualifications, the Government's Expert Notice provided Mr. Petersohn's resume and examples of his prior testimony, and set forth his anticipated testimony in this case, including a draft presentation that Mr. Petersohn had compiled, which

details the records upon which his testimony is based, as well as the specific date, times, and cellular devices on which his anticipated testimony is focused.  (*Id.*).

The Government's Expert Notice is more than adequate to describe Mr. Petersohn's actual opinion, the bases for his opinion, and his qualifications.  The defendant's argument to the contrary ignores the Expert Notice and amounts to a generic request for more detail.  To the extent the defendant is requesting to know where the relevant cell sites were located, that information is quite plain in the draft presentation provided with the Government's Expert Notice and accessible in the cell site records referenced in the Government's Expert Notice and produced in discovery.

In any event, even if the Court finds the Government's disclosure inadequate, preclusion of Mr. Petersohn's testimony is not the appropriate remedy.  Preclusion of expert testimony is "extreme."  *United States v. Raniere*, 384 F. Supp. 3d 282, 327 (E.D.N.Y. 2019) (noting that preclusion of expert testimony typically occurs where untimely disclosures occur "on the first day of trial or later").  Even where expert notice is found inadequate, courts routinely order parties to supplement their expert disclosure without resorting to preclusion.  *See, e.g.*, *United States v. Valle*, No. 12 Cr. 847 (PGG), 2013 WL 440687, at *6 (S.D.N.Y. Feb. 2, 2013); *United States v. Rajaratnam*, No. 09 Cr. 1184 (RJH), 2011 WL 723530, at *7 (S.D.N.Y. Feb. 25, 2011).  Here, however, the Government's disclosure is more than sufficient.

### 2.  Mr. Petersohn's Anticipated Testimony Satisfies the Liberal Requirements of Rule 702

In *United States v. Natal*, 849 F.3d 530 (2d Cir. 2017), the Second Circuit held that "testimony on how cell phone towers operate must be offered by an expert witness."  *Id.* at 536. Accordingly, the defendant's contention that Mr. Petersohn's expected testimony concerning the operations of cellular networks does not require expert testimony is contradicted by Second Circuit law and by the facts of this case.

*First*, Mr. Petersohn's expected opinion testimony concerning the likely approximate locations of the Subject Devices will be based on specialized knowledge of the operation of cellular networks.  Mr. Petersohn is expected to testify that several of the Subject Devices connected to the same two cell sites near the Russell Home, which are two of the closest cell sites to that location.  Mr. Petersohn will also explain why a call can be "passed" between cell sites mid call, and what factors lead a particular call to connect with a particular cell site.  In other words, Mr. Petersohn's opinions will not be based on a straight-forward mapping of geolocation information obtained from cellphone providers.  Nor will his testimony be based on some basic understanding of cell site records.  Rather, Mr. Petersohn will rely on his training, education, and experience, including his participation in drive tests conducted for the purpose of evaluating cellular network performance, in rendering his opinions about the likely approximate locations of the Subject Devices at certain points of time.  That testimony would not "result[ ] from a process of reasoning familiar in everyday life," *Cuti*, 720 F.3d at 459 (alteration in original), but instead would reflect "scientific, technical, or other specialized knowledge," Fed. R. Evid. 701(c).  Accordingly, Mr. Petersohn's opinions are properly made by an expert.

Indeed, the defendant's reliance on *United States v. Nieves*, only supports the expert testimony that the Government seeks to introduce.  No. 19 Cr. 354 (JSR), 2021 WL 1535338 (S.D.N.Y. Apr. 19, 2021).  In *Nieves*, the Court precluded the Government's expert because he was not a "scientist or engineer" and was not "able to give a detailed account of the scientific methodology underlying his opinion."  *Id.* at *1.  The defendant does not challenge Mr. Petersohn's qualifications on those grounds, nor could he, given Mr. Petersohn's qualifications as an engineer.  Accordingly, Mr. Petersohn's expected testimony is properly characterized as expert testimony.

*Second*, Mr. Petersohn has testified in this District, as an expert witness, in numerous cases

and was permitted to render opinions about the likely approximate locations of certain cellphones. *See, e.g.*, *United States v. Scales*, No. 19 Cr. 96 (JSR); *United States v. Ray*, No. 20 Cr. 110 (LJL), 2022 WL 101911 (S.D.N.Y. Jan. 11, 2022); *United States v. Abreu*, 21 Cr. 300 (JMF).  Indeed, courts around the country routinely allow expert witnesses to testify about cellphone location records.  *See United States v. Hill*, 818 F.3d 289, 296 (7th Cir. 2106) (noting that it was undisputed that testimony about historical cell-site analysis is expert testimony); *United States v. Reynolds*, 626 F. App'x 610, 617 (6th Cir. 2015) (holding that government's expert witness opinion testimony about historical cell site was reliable and admissible).  The defendant has not and cannot articulate a basis upon which to differentiate Mr. Petersohn's expected testimony in this case from the many other cases in this District and around the country in which cell site experts (including Mr. Petersohn) were permitted to offer opinions about the likely approximate locations of cellphones.

*Third*, the Second Circuit has specifically warned against the use of lay witnesses in this area.  In *Natal*, the Second Circuit "caution[ed] that the line between testimony on how cell phone towers operate, which must be offered by an expert witness, and any other testimony on cell phone towers, will frequently be difficult to draw, and so both litigants and district courts would be well advised to consider seriously the potential need for expert testimony."  849 F.3d at 536; *see also United States v. Medley*, 312 F. Supp. 3d 493, 498 (D. Md. 2018) (noting that the Government was "wise" and "correct" to designate their cell site witness as an expert because pinpointing when a laymen offered for cellphone location evidence enters the realm of an expert is "risky business."). The Second Circuit went on to hold that the cell site testimony at issue in *Natal*—that the defendant could not have been at a certain location because his cellphone was using a cell site in another location—required testimony on the possible ranges of certain cell sites and how they operate,

which required expertise.  *Id.* at n.5.  Like the cell site witness in *Natal*, Mr. Petersohn's opinions will be based on, among other things, the ranges of certain cell sites which, as directed by the Second Circuit in *Natal*, requires expert testimony.

*Finally*, the defendant should not be permitted to have it both ways.  In his motion, the defendant suggests that only a lay witness can testify about the location of the Subject Devices because no technical background or specialized knowledge is necessary to render such an opinion. At trial, however, the defendant would presumably cross-examine the Government's lay witness and attempt to undercut his or her testimony, at least in part, by asking questions that the lay witness would be unable to answer precisely because he or she does not possess the specialized knowledge that the defendant is (currently) claiming is not needed.  This should not be permitted.

### 3.   Mr. Petersohn's Expected Testimony Is Admissible under Rule 403

To the extent the defendant contests the relevance of Mr. Petersohn's expected testimony more generally, that argument also fails.  The Government expects Mr. Petersohn to testify regarding the location of the Subject Devices in or around the time of the Threat Call, which was made from the landline of the Russell Home in Chicago.  Specifically, Mr. Petersohn will testify that Mr. Russell's cellphones were connecting to two of the cell towers closest to the Russell Home in Chicago, Illinois around the time of the Threat Call.  This evidence will show that Mr. Russell was near his home at the time of the Threat Call and, therefore, had access to the landline in the Russell Home that was used to transmit the Threat Call.  Mr. Petersohn will also testify that CC-2's phone was connecting to these same cell towers around the time of the Threat Call.  The location of the defendant's and CC-2's cellphones in proximity to the Russell Home and to each other at the time of the Threat Call corroborates the phone records and text messages demonstrating that the defendant made the Threat Call (and that CC-2 was at the Russell Home at the time of the

Threat Call).  Further still, that two of CC-1's phones were located in the same part of New York at this time corroborates the text messages and electronic evidence that CC-1 was in New York on the day of the Screening and purported to report to the defendant live updates on their efforts to stop the Screening from proceeding.  As the defendant states, one of the key issues for the jury will be whether the defendant made the Threat Call, and Mr. Petersohn's testimony about the location of the defendant's and his co-conspirators' cellphones at the time of the Threat Call is highly probative on that issue.[1]

Nor does the defendant articulate any unfair prejudice under Rule 403.  Far from distracting the jury, Mr. Petersohn will be explaining a matter that the Second Circuit has held "must be offered by an expert witness."  *Natal*, 849 F.3d at 536.  The defendant has not articulated any unfair prejudice from this testimony and the defendant's Rule 403 argument thus fails.[2]

## II.  The Defendant May Be Cross-Examined About His February 2018 Gun Threat

According to a police report, on February 18, 2018, police responded to the Russell Home for a domestic violence disturbance.  The victim reported to the police that during a verbal altercation with the defendant, she told the defendant that she was leaving him and moving out of state.  In response, the defendant slapped the victim with an open hand "causing minor swelling" to her cheek.  The victim further reported that when she called 911, the defendant stated that if the victim makes a report against him, it will "ruin his business reputation."  The victim then reported to officers that the defendant threatened to shoot the victim in her head and "blow her brains out"

---

[1]  Mr. Petersohn will not testify about the defendant's mental state when making these calls, so the defendant's purported concern under Rule 704(b) (*see* Dkt. No. 48 at 6-7) is inapposite.

[2]  Given the plain relevance of this testimony and the fact that Mr. Petersohn has testified as an expert witness at several trials in this District, the defendant's unsupported request for a *Daubert* hearing should be rejected.

if she made a report (the "February 2018 Gun Threat").  The defendant moves to preclude admission of evidence of the February 2018 Gun Threat.  (Dkt. No. 52).

As an initial matter, and as the defendant notes in his motion, the Government does not intend to introduce evidence of the February 2018 Gun Threat in its case in chief.  However, the Government does reserve its right to cross-examine the defendant on the February 2018 Gun Threat if he chooses to testify, and therefore opens the door to this evidence.

### A.  Applicable Law

A district court "has broad discretion in determining what issues may be raised on cross-examination for the purpose of impeaching the credibility of a witness."  *United States v. Abdallah*, 840 F. Supp. 2d 584 (E.D.N.Y. 2012).  And, as the Supreme Court has noted, "It is essential . . . to the proper functioning of the adversary system that when a defendant takes the stand, the government be permitted proper and effective cross-examination in an attempt to elicit the truth."  *United States v. Havens*, 446 U.S. 620, 626, 27 (1980).  Accordingly, "[w]hen a defendant offers an innocent explanation he 'opens the door' to questioning into the truth of his testimony, and the government is entitled to attack his credibility on cross-examination."  *United States v. Payton*, 159 F.3d 49, 58 (2d Cir. 1998).

### B.  Discussion

The Government expects that if the defendant elects to testify, he may claim that the Threat Call was in fact a misunderstanding between him and the Employee, and he will portray himself as a law-abiding citizen who wanted to stop the Screening in a professional manner.  The Government should be permitted to rebut that purported explanation with evidence that the defendant resorted to a similar gun threat months earlier when he wanted to stop someone from reporting a domestic violence allegation against him to the police.  *See, e.g.*, *United States v. Beverly*, 5 F.3d 633, 640 (2d Cir. 1993) (government permitted to elicit evidence of shootings to

9

discredit defendant's "self-depiction" as a "law-abiding musical performer who had nothing to do with guns"); *United States v. Garcia*, 936 F.2d 648, 654 (2d Cir. 1991) (district court properly allowed cross-examination of defendant on prior cocaine use after defendant claimed that "had no idea that the white powder was cocaine"); *see also United States v. Mustafa*, 753 F. App'x 22, 38 (2d Cir. 2018) ("This comports with precedent recognizing that where a defendant testifies on direct examination about specific facts, the prosecution may use cross-examination to prove that the defendant lied as to those facts.").

Indeed, the February 2018 Gun Threat involves a markedly similar fact pattern to the Threat Call. The defendant, worried that the victim was going to report an instance of domestic abuse to the police, threatened the victim with gun violence to discourage her from contacting the police. This threat also occurred at the Russell Home. The Government therefore is permitted to cross-examine the defendant on this prior gun threat if he were to take the stand and (presumably) provide an "innocent explanation" for making the Threat Call and depict himself as a law-abiding business professional who attempted to stop the Screening in a "professional" manner. *See, e.g.*, *Payton*, 159 F.3d at 58 ("When a defendant offers an innocent explanation he 'opens the door' to questioning into the truth of his testimony, and the government is entitled to attack his credibility on cross-examination.").

In addition to directly rebutting defendant's expected testimony that he did not intend to communicate a threat on the Threat Call, the February 2018 Gun Threat also undercuts the defendant's credibility. The February 2018 Gun Threat demonstrates that the defendant took steps to prevent the victim from truthfully reporting an incident of domestic violence to the police. The February 2018 Gun Threat therefore reflects the defendant's character for dishonesty when communicating with law enforcement and is proper grounds for cross-examination. Accordingly,

the Government should be permitted to inquire about the February 2018 Gun Threat on cross-examination.  *See* Fed. R. Evid. 608(b); *United States v. Teron*, 478 F. App'x 683, 685 (2d Cir. 2012) ("The district court has discretion to allow cross-examination regarding 'specific instances of conduct' under Federal Rule of Evidence 608(b) if the conduct is 'probative of truthfulness or untruthfulness.'").[3]

### III. The Employee Should Be Permitted to Testify to his Understanding that the Threat Call Contained a Threat

The defendant next asks this Court to limit the scope of the Employee's testimony to preclude him from testifying that the Threat Call "constituted a threat, as that is the ultimate issue for the jury." (Dkt. No. 50 at 1).  He argues that the Employee should be precluded from "offer[ing] his own opinion whether that call contained a threat, because that is the ultimate factual issue for the jury to determine."  (*Id.* at 8).  The defendant further previews that he intends to oppose the Government's motion *in limine* to admit the Employee's 911 Call as "it would be especially problematic to admit the 911 recording in which the [Employee] refers to the call he received as a threat." (*Id.*).

The Court should reject the defendant's motion to place artificial limits on the Employee's testimony.  The Court should likewise deny the defendant's request to excise segments of the 911 Call—a call which should be played in its entirety to the jury (*see* Dkt. No. 44 at 12-19)—during which the Employee stated that he received an "anonymous call about a threat." (Dkt. No. 44, Ex. A at 0:54-0:56).  The relief sought by the defendant is unsupported by the law and should be denied.

---

[3] The defendant's February 2018 Gun Threat is also not more inflammatory than the charged crime, which also involves a gun threat.  The defendant is charged with calling a theater crowded with people and stating that a person inside the theater had a gun and was going to shoot up the place. Accordingly, the probative value of the February 2018 Gun Threat is not outweighed by any potential for unfair prejudice.

## A.  Applicable Law

As noted above, opinion testimony from lay witnesses is admissible pursuant to Rule 701, when it is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  Fed. R. Evid. 701.  A rational perception is one involving first-hand knowledge or observation.  *United States v. Rea*, 958 F.2d 1206, 1215 (2d Cir. 1992).  "[L]ay opinion must be the product of reasoning processes familiar to the average person in everyday life." *United States v. Garcia*, 413 F.3d 201, 215 (2d Cir. 2005).

## B.  Discussion

The Employee's testimony about whether he understood the Threat Call to be a threat meets the three requirements of Federal Rule of Evidence 701.  First, the Employee's anticipated testimony will be "rationally based" on his perception of the call from the Russell Landline that only he received.  Second, the Government anticipates that such testimony will be helpful to the jury as part of the evidence of the defendant's intent and how the Employee reacted upon receiving the Threat Call.  *See United States v. Balkany*, 468 F. App'x 49, 53 (2d Cir. 2012) (holding that Government witness's testimony during redirect examination, during which he used the term "threat," among others, "by countering the false impression created by defense counsel's questioning, satisfied Rule 701's requirement that lay opinion testimony be 'helpful.'").  And third, such testimony will not be "based on scientific, technical, or other specialized knowledge within the scope of Rule 702" but will instead be based on his experience receiving the Threat Call.  Fed. R. Evid. 701(c).

The defendant does not cite a single case in support of his motion.  He ignores two recent district court decisions that considered and squarely rejected the precise issues raised by the defendant.  In *United States v. Scarborough*, the defendant, who was charged with threatening to

assault and murder a federal law enforcement officer, in violation of 18 U.S.C. § 115(a)(1)(B), moved to preclude Government witnesses from characterizing his communications as "threats" or "threatening."  No. 13 Cr. 72, 2015 WL 1579585, at *1-2 (M.D. Tenn. Apr. 9, 2015).  The court rejected the defendant's motion, concluding that Government witnesses were permitted to use those words during their testimony "only when expressing their personal understanding" of the defendant's statements.  *Id.* at *4.  In so finding, the court explained that while the defendant was "correct that the jury must determine whether his communications were 'true threats,' the perceptions of Government witnesses are certainly relevant for trial. . . . As such, the impressions and responses of Government witnesses are probative (though not determinative) of the believability of the alleged threats."  *Id.* at *3.  The court further noted that such testimony from a Government witness would not be "an impermissible legal conclusion for two reasons."  *Id.*  "First, the word 'threat' has a common meaning that witnesses should be permitted to use, outside of its legal meaning in this case" and "there is no useful substitute for the words 'threat' or 'threatening' in the everyday sense."  *Id.*  Second, the question of what constitutes a threat is not dependent on the subjective response of the recipient, but instead focuses on whether a reasonable person would interpret the communication as a threat.  *Id.*; *see* Dkt. No. 43 at 6 (Government's Request to Charge No. 3: "For a statement to be a threat, the statement must have been made under such circumstances that a reasonable person who heard or read the statement would understand it as a serious expression of an intent to inflict bodily injury.").  The court found that "while evidence of a particular recipient's interpretation of and response to a statement is relevant, such testimony could not represent an ultimate legal conclusion as to any of the elements in a § 115(a)(1)(B) case."  *Scarborough*, 2015 WL 1579585, at *3.  Moreover, the court rejected the defendant's argument challenging the use of the words "threat" and "threatening" under Rule 403.  *Id.*  The court

13

concluded:

> [A] witness's use of the words "threat" or "threatening"-if used to describe his or her own subjective understanding of Defendant's communications-would not unfairly prejudice Defendant or mislead the jury. The witnesses must be allowed to express their perceptions of the communications at issue. The risk of prejudice or confusion is moderate in comparison to the value of such testimony. Any potential prejudice or confusion will be minimized by the parties' arguments and cross-examination of witnesses, as well as our jury instructions.

*Id.* at *4.

The District Court for the District of Colorado recently rejected a similar motion to preclude Government witnesses from using the words "threat" and "assault" on the grounds that such words are legal conclusions. *United States v. King*, No. 19 Cr. 257 (WJM), 2022 WL 227242 (D. Col. Jan. 26, 2022). The defendant was charged with one count of assaulting or obstructing a federal official, in violation of 18 U.S.C. § 111(a)(1), (b). *Id.* at *1. The court concluded that the prejudicial effect of using the terms "threat" and "assault" at trial did not outweigh the probative value of these terms. *Id.* at *7. Instead, to prohibit the use of such terms "*would* result in witnesses engaging in 'unnecessary verbal gymnastics.'" *Id.* The court further concluded that there was a low risk of jurors drawing a legal conclusion based on the use of such terms—terms with which a jury will be "very familiar"—and noted that the parties could propose "a limiting instruction to protect against such a possibility." *Id.*

While the Government agrees that the jury must ultimately make the determination whether the defendant's statements were "threats" under the law, the use of the word "threat" by the Employee during his testimony to describe his perception of the Threat Call, or his use of that word during the recorded 911 Call, is not inherently prejudicial. The Government anticipates that the defendant is going to challenge the Employee's recollection of the Threat Call, claiming that

14

the Employee misunderstood what the defendant said during the call.  The Employee's testimony regarding his perception of the Threat Call—and the 911 Call he made 14 minutes after the Threat Call during which the Employee stated that he had received an "anonymous call about a threat" (Dkt. No. 44, Ex. A at 0:54-0:56)—are directly relevant to respond to the defendant's challenges and to clarify any "false impression created by defense counsel's questioning."  *Balkany*, 468 F. App'x at 53.

Whether a witness felt subjectively threatened is relevant and admissible.  The Court will give the jury appropriate instructions regarding the legal definition of what constitutes a criminal threat.  Such jury instructions and arguments from counsel will eliminate any potential confusion.  The Government would not object to the Court providing a limiting instruction after the conclusion of the Employee's testimony and the playback of the 911 Call.  *See Balkany*, 468 F. App'x at 53 (stating that after the Government witness "used the terms 'threat' and 'fraud,' the District Court carefully instructed the jury that it should take those words in their 'common everyday' sense, and that the Court would provide the legal definitions of those terms when charging the jury at the close of trial. There was nothing complicated about those instructions, and we presume that the jury followed them.").

To grant the defendant's motion and hold that the Employee cannot say that he understood the Threat Call to be a threat would unfairly prejudice the Government and is not supported by the law.  Accordingly, the defendant's motion should be denied.

### IV.  The Court Should Deny the Defendant's Request for Written Juror Questionnaires

The defendant requests that the Court administer a juror questionnaire to prospective jurors in this case, claiming that there is "a significant risk of potential juror prejudice caused by press coverage."  (Dkt. No. 54 at 4).  He argues that a written questionnaire is necessary because the case stems from allegations relating to the screening of "Surviving R. Kelly" which "garnered

considerable media attention, especially in the New York area" and that media attention "was and will be compounded further by" Kelly's trial and sentencing in the Eastern District of New York and his upcoming trial in the Northern District of Illinois. (*Id.*). The defendant's motion should be denied. A juror questionnaire is neither warranted nor appropriate here and would only needlessly prolong and delay the jury selection process. The Court can and will take all appropriate measures to safeguard the defendant's right to a fair and impartial jury by, among other things, conducting a proper *voir dire* and providing appropriate jury instructions.

### A. Applicable Law

"[T]he obligation to impanel an impartial jury lies in the first instance with the trial judge." *Rosales-Lopez v. United States*, 451 U.S. 182, 189 (1981). It is well-established that because federal judges "must rely largely on [their] immediate perceptions" to impanel an impartial jury, district courts "have been accorded ample discretion in determining how best to conduct the *voir dire*." *Id.* (citing cases); *United States v. Harding*, 273 F. Supp. 2d 411, 429 (S.D.N.Y. 2003) (same); *see also United States v. Quinones*, 511 F.3d 289, 299 (2d Cir. 2007). Accordingly, "[w]hether to use a jury questionnaire is within the discretion of the Court." *United States v. Tomero*, 486 F. Supp. 2d 320, 324-25 (S.D.N.Y. 2007) (citing cases); *see also, e.g.*, *United States v. Treacy*, 639 F.3d 32, 47 (2d Cir. 2011) (court did not abuse discretion in denying request for juror questionnaire); *United States v. Salameh*, 152 F.3d 88, 120-21 (2d Cir. 1998) (same). The Second Circuit thus "will not interfere with the manner in which the district court has chosen to conduct voir dire unless an abuse of discretion is 'clear.'" *Treacy*, 639 F.3d at 46.

### B. Discussion

A juror questionnaire in this case is neither warranted nor necessary and would be cumbersome, inefficient, and could hinder jury selection. The defendant's right to a fair trial and

to a fair jury "will be protected adequately even without use of a jury questionnaire" through a proper *voir dire* and jury instructions. *Tomero*, 486 F. Supp. 2d at 325. For the following reasons, the Court should exercise its sound discretion to deny the defendant's request for a juror questionnaire.

*First*, a juror questionnaire is not necessary or warranted in this case. In this District, juror questionnaires traditionally have been used in a limited number of exceptional cases. For instance, courts have used written questionnaires in extraordinary cases in which a large number of prospective jurors might need to be screened, whether because of the exceptionally high-profile nature of the case, *see, e.g.*, *United States v. Rahman*, 189 F.3d 88, 121-22 (2d Cir. 1999) (discussing the use of a written jury questionnaire in the trial of individuals charged with, among other things, providing support to the individuals responsible for the 1993 World Trade Center bombing), as a result of the decision to empanel an anonymous jury, *see, e.g.*, *United States v. Thai*, 29 F.3d 785, 800-01 (2d Cir. 1994) (discussing the use of a written jury questionnaire in selecting an anonymous jury as a result of, among other things, two defendants having threatened and killed a civilian witness), in cases involving exceptionally extensive pre-trial publicity, *see, e.g.*, *United States v. Stewart*, 433 F.3d 273, 303-04 (2d Cir. 2006) (discussing the use of a written jury questionnaire in the criminal trial of Martha Stewart), and in capital cases, *see, e.g.*, *Quinones*, 511 F.3d at 299-300 (discussing the use of a written jury questionnaire in a case in which jurors were asked to deliberate, following a penalty phase, as to whether or not to impose the death penalty).

The defendant contends that a juror questionnaire is appropriate because "there can be no doubt that this is a case with extensive pre-trial publicity." (Dkt. No. 54 at 7). While the cases against R. Kelly and the docuseries "Surviving R. Kelly" have indeed garnered significant press

coverage, the defendant dramatically overstates the volume and reach of the pre-trial publicity in *this* case.  The defendant himself acknowledges that his case "stands apart from Mr. Kelly's case" and notes that the Government "has agreed to limit its presentation of evidence relating to Mr. Kelly."  (*Id.* at 4).  This is simply not the kind of case in which a juror questionnaire is warranted.  Judges in this District regularly impanel fair and impartial juries in high-profile cases by conducting proper *voir dire* and providing adequate jury instructions.  *See, e.g.*, *United States v. Ray*, 10 Cr. 110 (LJL) (Dkt. No. 290 at 4) (denying defendant's request for a juror questionnaire as the case did not involve "such extensive pretrial publicity . . . that jury selection [could not] be handled in the ordinary manner through oral voir dire"); *United States v. Doud*, 19 Cr. 285 (GBD) (Dkt. No. 134 at 86) (holding that a juror questionnaire was inefficient and not "necessary" because the Court could "adequately address the issues" and questions for the potential jurors and concluding that the case was not "so unique[] that it would warrant a jury questionnaire" and that the "nature of the questions in the jury questionnaire are pretty much the questions that I can ask as a group of the jurors and have them indicate whether they have some response and follow-up questions with those jurors."); *United States v. Parnas*, 19 Cr. 725 (JPO) (Dkt. No. 275 at 13) (denying defense request for written questionnaire, stating: "I'm not planning to do a written questionnaire in this case.  I find that questioning the potential jurors in person is more reliable and efficient.  And I will ensure that a fair jury is selected."); *United States v. Hadden*, 20 Cr. 468 (RMB) (Dkt. No. 151 at 1) (denying defense request for juror questionnaire as "not necessary to select a fair and impartial juror in this case" and noting the Court's practice of conducting trials, "including those trials involving pretrial publicity," without using a juror questionnaire).  This case is no different.

*Second,* the defendant's right to a fair and impartial jury can be adequately—indeed, best—

18

protected through the Court's *voir dire* and jury instructions.  To the extent the Court elects to ask prospective jurors limited questions relating to sexual abuse as proposed by the defendant (*see* Dkt. No. 46 at 3-4; Dkt. No. 54-1 at 9-10) or the Government (Dkt. No. 42 at 4-5), as a matter of common sense, it would be preferable for the Court in the first instance and in person to pose questions to potential jurors about this potentially personal subject matter.  The Court's in-person *voir dire* is preferable to posing such sensitive questions to potential jurors through an impersonal written questionnaire calling for a formal written response.  In-person questioning would also allow the Court and the parties to directly assess the jurors and their responses—and to ask follow-up questions on the spot.  *See Rosales-Lopez*, 451 U.S. at 189.[4]  A careful and thoughtful approach to jury selection can certainly be achieved through the Court's proper *voir dire*.

*Third*, a juror questionnaire would be cumbersome and inefficient.  It would prolong jury selection and lead to an undue waste of judicial resources that is neither in the interest of the public or of the prospective jurors.  If a juror questionnaire was administered in this case, the Government understands that the process would entail the following: summoning prospective jurors to the courthouse to read through and complete the juror questionnaires; review of the juror questionnaires by the Court, the defense, and the Government in order to determine which jurors, if any, should be removed from the venire for cause; and oral *voir dire*.  This three-step process could take several days, if not longer.  An oral *voir dire* would eliminate the first two steps.  Jury selection would thus begin with the oral questioning of prospective jurors and the parties could propose juror strikes the same day.  Such a process would lead to the same outcome: the selection of a fair and impartial jury.

---

[4] It is difficult to predict whether jurors would be more apt to respond openly and comprehensively to a written juror questionnaire or in-person.

Accordingly, the Government respectfully requests that the Court deny the defendant's request for a juror questionnaire.

## V. The Defendant's Generic Relevance Arguments Fail

### A. Background

The defendant seeks to exclude as irrelevant certain categories of evidence at trial.[5] Specifically, the defendant seeks to preclude the Government from introducing evidence that the docuseries included allegations of abuse against R. Kelly; evidence about the Screening itself, including that the Screening was scheduled to include a panel discussion during which R. Kelly's victims would speak; and a three-minute clip of a public interview in which the defendant made a number of admissions regarding the Threat Call.  (Dkt. No. 56).

As explained below, background evidence on the docuseries and the Screening goes directly to the defendant's motivation for making the Threat Call and therefore is highly probative of the defendant's guilt.  Similarly, during the defendant's public interview (of which the Government plans on introducing a short three-minute clip), the defendant admitted, in substance and in part, that a threat was called into the Theater; the defendant was in contact with the Theater all day; and that the defendant was happy that the Threat Call was made because it allowed him to pursue business ventures with R. Kelly.  All of this evidence is extremely probative of the

---

[5] The defendant frames this motion as one to preclude references to the defendant's case in the Eastern District of New York and R. Kelly's criminal conviction.  The Government does not intend to elicit evidence about the defendant's separate case in the Eastern District of New York, except to the extent that the defendant's threats and intimidation of R. Kelly's victims are also evidence of his commission of this offense.  The Government addressed this issue in its initial motion *in limine*, which sought admission of the defendant's threats after he made the Threat Call.  (Dkt. No. 44 at 19-24).  Similarly, the Government does not intend to elicit evidence regarding R. Kelly's criminal prosecution or sentence.  However, as explained in the Government's motion *in limine*, the defendant, in a public interview, defended the Threat Call because it was not responsible for R. Kelly being held without bail.  (*Id.* at 11).  As explained below, that statement is highly probative of the defendant's guilt and is admissible.

defendant's guilt and the defendant has not identified any possible unfair prejudice. Accordingly, the defendant's arguments fail.

### B.   Applicable Law

Rule 401 imposes a "relatively low bar" of relevance. *United States v. Ray*, No. 20 Cr. 110 (LJL), 2022 WL 374367, at *9 (S.D.N.Y. Feb. 8, 2022) (internal quotation marks and citation omitted). Indeed, "[t]o be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency. Relevant evidence is not confined to that which directly establishes an element of the crime." *United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997). Federal Rule of Evidence 403 provides that a court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." All evidence of guilt is, of course, prejudicial, in the sense of disadvantaging the defense, but that does not mean it is "unfairly" prejudicial. *Costantino v. Herzog*, 203 F.3d 164, 174 (2d Cir. 2000) ("Because virtually all evidence is prejudicial to one party or another, to justify exclusion under Rule 403 the prejudice must be unfair."). The Supreme Court has defined "unfair prejudice" as "the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof of the specific offense charged." *Old Chief v. United States*, 519 U.S. 172, 180 (1997).

### C.   Discussion

The defendant's attempt to exclude evidence about the docuseries and background about the Screening rests on the incorrect premise that "[a]ny documentary could have been playing and the analysis for the jury in this case would not change." (Dkt. No. 56 at 6). This argument ignores the key evidence demonstrating *why* the defendant made the Threat Call: that is, the defendant wanted to stop the Screening *because* it was going to hurt R. Kelly and the defendant's business

ventures with R. Kelly.  As described in the Government's motion, the defendant's texts and emails (as well as the defendant's own admissions) make clear that the defendant wanted to stop the Screening from going forward because of the economic and reputational harm it would cause to R. Kelly.  (Dkt. No. 44 at 5-8).  Indeed, the defendant devoted much of the day on December 4, 2018 leading up to the Threat Call attempting to discourage Lifetime from continuing with the docuseries.  (*Id.* at 2-4).  The background of the docuseries and the context of the Screening (in which victims of R. Kelly were going to speak publicly together for the first time) is therefore highly probative of the question of whether the defendant made the Threat Call and what he said on the call.  The Government will argue that the Threat Call came from the defendant's home and perfectly aligned with the defendant's admitted motivation the entire day—to stop the Screening. Far from irrelevant, this evidence is devastating proof of the defendant's identity and intent to make the Threat Call—two key issues at trial.

This Court should also reject the defendant's attempts to strip the Threat Call from its relevant context, including *why* the Threat Call was made and the impact the Threat Call had on the Theater.  Indeed, the defendant's contention that, "[w]hether a call was placed and whether it constituted a threat does not turn on what the theater was showing, but simply evidence of the call and its contents," Dkt. No. 56 at 3, is contrary to the law.  Rather, "[t]o determine whether or not the defendant made a threat, [the jury] should consider the circumstances under which the statement was made, including its context with respect to surrounding conversation, the language the defendant used, and the reaction of those who heard the statement."  (Dkt. No. 42 at 5 (Government's Proposed Requests to Charge)).  Context in this case, then, is central to this case. The context of the Screening and docuseries explains why it was *Donnell Russell* who made the Threat Call.  The context of the Screening and docuseries explains *why* Donnell Russell made the

Threat Call.  And the context explains why Donnell Russell intended to communicate a threat (and knew the Employee would understand it to be a threat) on the Threat Call.[6]  To limit the evidence to the contents of one call, as the defendant suggests, would substantially prejudice the Government, and would mislead the jury.

In the same way, the defendant's public admissions about the Threat Call are devastating evidence of his guilt.  After the Screening, the defendant gave a publicly available interview that was streamed on YouTube.com.  The Government intends to introduce a three-minute clip of this interview.[7]  In this interview, the defendant made a number of incriminating admissions, including that he "called the venue," and that the defendant was on the phone with the venue "the whole day trying to get them not to air it."  (Ex. B at 1:10-1:1:37).  Further still (and contrary to the defendant's current position that there was not a threat call), the defendant made very clear that, "yes, there was a threat called in."  (*Id.* at 0:30-0:33).  The defendant went even one step further by *defending* the mystery person who did make the Threat Call because that person "stopped it," and allowed the defendant and R. Kelly to set up concerts.  (*Id.* at 0:40-0:54).  Had the Threat Call not happened, the defendant said, "there would have been way more damage."  (*Id.* at 0:54-1:10).  Finally, the interviewer asked the defendant, "so there was a rumor saying that you did it and you wanted to clarify and say that it wasn't you."  (*Id.* at 2:45-2:58).  The defendant responded, "No,

---

[6] For example, the Government intends to call an attendee at the Screening to provide brief background on NeueHouse, the Screening, and to describe how he was evacuated from the building after the Threat Call.  The witness's testimony not only corroborates the Employee's testimony regarding the timing of the Threat Call, but also speaks directly to the "reaction of those who heard the statement," because it demonstrates that the Employee and NeueHouse management took the Threat Call so seriously as to abruptly stop the Screening and evacuate the building. Indeed, the Government anticipates that the witness will testify that he was told there was a threat and attendees needed to evacuate the building.

[7] The clip of the interview is described at length in the Government's initial briefing (Dkt. No. 44 at 11) and is attached to this motion as Exhibit B.

there is a rumor that's what is keeping [R. Kelly] from getting bail in New York, which is bullshit." (*Id.*).  In other words, the defendant did not want to clarify that he did not make the Threat Call, but wanted to clarify that the Threat Call was not responsible for keeping R. Kelly detained in jail.

The defendant's interview is extremely probative of his guilt.  The defendant admitted to a number of key facts of the case, including that there was a Threat Call and that the defendant was pleased that the Threat Call stopped the Screening.  On the other side of the balancing test under Rule 403, any potential for unfair prejudice from this evidence does not outweigh its probative value.  Evidence is unfairly prejudicial "only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence." *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980).  All relevant evidence is to some degree prejudicial; unfair prejudice means, however, an "undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."  Rule 403, Advisory Comm. Note; *cf. Constantino v. Herzog*, 203 F.3d 164, 174 (2d Cir. 2000) ("Because virtually all evidence is prejudicial to one party or another, to justify exclusion under Rule 403 the prejudice must be unfair.").

While the evidence is inculpatory, none of this evidence would result in unfair prejudice to the defendant.  Contrary to the defendant's argument, the Government will not introduce clips of the defendant's interview beyond the three-minute discussion of the Threat Call.  And the testimony and evidence about the subject matter of the docuseries will come in the form of a short minutes-long trailer and witness testimony.  Indeed, the only references to R. Kelly's incarceration on his case in the Eastern District of New York will be the defendant's own explanation of the Threat Call in the public interview after the Threat Call.  Accordingly, the clear probative value of this evidence is not outweighed by the potential for unfair prejudice, and the evidence is admissible

24

under Rule 403.

## CONCLUSION

For all of the foregoing reasons, the Government respectfully submits that the Court deny

the defendant's motions *in limine* in their entirety.

Dated:  New York, New York
        July 5, 2022

                                              Respectfully submitted,

                                              DAMIAN WILLIAMS
                                              United States Attorney for the
                                              Southern District of New York

By:     s/                    
                Peter J. Davis / Lara Pomerantz
                Assistant United States Attorneys
                (212) 637-2468 / 2343