UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

   -v.-

DONNELL RUSSELL,

                Defendant.

**20 Cr. 538 (PGG)**

**THE GOVERNMENT'S MEMORANDUM IN OPPOSITION
TO THE DEFENDANT'S POST-TRIAL MOTIONS**

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Peter J. Davis
Lara Pomerantz
Assistant United States Attorneys
   *Of Counsel*

# Table of Contents

**PRELIMINARY STATEMENT** ..................................................................................................**2**

**BACKGROUND** .......................................................................................................................**2**

**ARGUMENT**...........................................................................................................................**5**

I.     The Court Should Deny the Defendant's Motion for Judgment of Acquittal Under Rule 29 ......... 5

A. Legal Standard ...................................................................................................................... 6

B. Discussion .............................................................................................................................. 7

II.    The Court Should Deny the Defendant's Motion for A New Trial Under Rule 33 ....................... 10

A. Legal Standard .................................................................................................................... 10

B. Discussion ............................................................................................................................ 11

**CONCLUSION** ......................................................................................................................**15**

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in opposition to the defendant's post-trial motions, dated August 5, 2022 ("Def. Mot.") (Dkt. No. 79).

## BACKGROUND

Count One of Indictment 20 Cr. 538 (PGG) charged the defendant with conspiring to transmit a threatening communication in interstate commerce, in violation of 18 U.S.C. § 371. Count Two charged the defendant with transmitting a threatening communication in interstate commerce, in violation of 18 U.S.C. § 875(c). Trial commenced on July 18, 2022 and ended on July 22, 2022, when the jury—after a few hours of deliberations—found the defendant not guilty of Count One, but found him guilty of Count Two.

The evidence at trial established that on December 4, 2018, the defendant made an interstate threat when he placed a phone call from his home in Chicago, Illinois to a venue in Manhattan, New York called NeueHouse ("NeueHouse") hosting a private screening of the Lifetime docuseries "Surviving R. Kelly" (the "Screening") and stated that someone at the event had a gun and was going to shoot up the place (the "Threat Call"). The NeueHouse employee who received that threatening phone call, Adrian Krasniqi, called 911 and the venue was evacuated and the Screening was shut down.

The Government presented a detailed chronology of text messages, phone calls, and emails demonstrating that the defendant made the Threat Call. This evidence, which was largely unchallenged at trial, showed, among other things, that the defendant took a series of escalating steps to stop the Screening on December 4, 2018. Those steps included the creation of a fake identity which the defendant used to contact Lifetime executives and alleged victims of R. Kelly.

In particular, the defendant created an email account under the name "Colon Dunn" and purported to be the lead investigator for R. Kelly. (GX 902). The defendant, using that alias, emailed executives at Lifetime and forwarded a PowerPoint containing opposition research on the docuseries participants to discourage Lifetime from moving forward with the Screening and the national airing of the docuseries. (*Id.*). Similarly, on the afternoon of December 4, 2018, the defendant used a Facebook account under that same alias to contact one of R. Kelly's alleged victims, Drea Kelly, to discourage her participation in the docuseries. (GX 902; GX 1419A).

When those efforts failed, the defendant contacted NeueHouse directly. (GX 902; GX 302). Between 6:16 p.m. and 6:18 p.m., the defendant called NeueHouse four times. When he spoke to Krasniqi on one of these calls, he pretended to be "Brian Nix," a legal representative for R. Kelly and demanded that NeueHouse stop the Screening. (Tr. 204-206; GX 1203). At 6:59 p.m., the defendant, again pretending to be Brian Nix, sent a "Cease and Desist" letter to NeueHouse using NeueHouse's online contact form. (GX 902; GX 1201). At 7:01 p.m., the defendant again called NeueHouse. (GX 902; GX 302). At 7:04 p.m., the defendant asked Kash Jones, "Are they continuing with the screening," to which Jones responded, "Yes." (GX 902; 1311). At 7:06 p.m., the defendant asked, "What room are the [sic] in." (GX 902; GX 403).

When the defendant's efforts to stop the Screening through a cease and desist failed, the defendant began calling law enforcement and fire department affiliates in Manhattan located in close proximity to NeueHouse. (GX 902; GX 1002). Between 7:12 p.m. and 7:27 p.m., the defendant called the Midtown South Precinct; the Transit District located in Union Square; the Firebell Club (an affiliate of the New York City Fire Department); the Fire Department's

Headquarters; and 311. (GX 902, GX 807). When the defendant called the Transit District, he dialed "*67" before making this call in an attempt to block his phone number. (GX 902; Tr. 153).

Following that series of calls, at 7:33 p.m., the defendant again called NeueHouse. (GX 902). And, at 7:34 p.m., the defendant again asked Jones, "Is the event still going on." (GX 902; GX 403). After Jones responded "Yes," at 7:36 p.m., the defendant texted Jones, "The cops maybe [sic] arriving shortly." (GX 902; GX 403). Then, at 7:37 p.m. and 7:38 p.m., the defendant used his landline phone number from his home to call NeueHouse again. (GX 902; GX 302).

Approximately 13 minutes after Russell placed those calls, at 7:51 p.m., Krasniqi called 911 and stated that "approximately ten minutes ago" he "got a call about an alleged shooter within the building with attempts to fire some shots during an event that we're holding." (GX 902; GX 701; GX 803). On that 911 call, Krasniqi explained that this "was an anonymous call about a threat" and that the caller said "someone had a gun at this event and that they would shoot up the place, quote un-quote." (GX 701). Krasniqi confirmed that this call was "made about ten minutes ago. Maybe less" and that he had "been acting as quick as [he] can about it" with "urgency to try and prevent anything." (GX 701). Indeed, Krasniqi testified that it felt like minutes passed between receiving the Threat Call and calling 911. (Tr. 208). Finally, Krasniqi explained on the 911 call that he had the "caller ID as well as the phone number," and that he could "speak to the police about that." (GX 701). Krasniqi testified that he feared for his safety and the safety of others in the building. (Tr. 209-10).

After Krasniqi called 911, at 8:05 p.m., the defendant texted Jones, "Delete those messages about 50." (GX 902; GX 403). The defendant's reference to "50" was a shorthand reference to

the police. (Tr. 161). The evidence at trial established that the defendant did, in fact, delete the text messages he had sent to Jones that "[t]he cops maybe arriving shortly" and his instruction to "[d]elete those messages about 50." (GX 808). When the police arrived, Krasniqi showed the police the call log, as he previewed on the 911 call. (Tr. 211). The NYPD then called Russell's landline four times. (GX 902; GX 309).

The Government also introduced the defendant's own public interviews where he admitted that (1) "there was a threat called in"; (2) he was "the person that was connected to, getting the cease and desist orders to the actual venue"; and (3) he "called the venue" and "was on the phone with them the whole day trying to get them not to air it [*i.e.*, the docuseries]." (GX 702). The defendant justified the Threat Call, explaining that because the Threat Call "stopped [the Screening]" and "if that event had taken place," R. Kelly would not have been able to set up concerts. (GX 702).

## ARGUMENT

### I. The Court Should Deny the Defendant's Motion for Judgment of Acquittal Under Rule 29

The defendant contends that the Government failed to prove that the defendant was the person who made the Threat Call on December 4, 2018. (Def. Mot. at 5-7). The defendant claims that (1) Krasniqi was "not sure what time he received the call and could not identify the phone number associated with the threat call"; (2) there was no evidence that it was the defendant's voice on the Threat Call; and (3) the Government's evidence regarding the landline used to make the Threat Call was "inconclusive," because, for example, Russell's home phone also served as a fax number. (*Id.*). The evidence that the defendant placed the Threat Call, however, was

overwhelming. Particularly when the evidence is viewed in a light that is most favorable to the Government, and with all reasonable inferences resolved in favor of the Government, the defendant's arguments are unpersuasive.

### A. Legal Standard

"[A] Rule 29 movant bears a heavy burden." *United States v. Klein*, 913 F.3d 73, 78 (2d Cir. 2019).[1] Under Rule 29 of the Federal Rules of Criminal Procedure, a court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). "In reviewing a Rule 29 motion, the court 'must view the evidence in a light that is most favorable to the government, and with all reasonable inferences resolved in favor of the government.'" *United States v. Joseph*, No. 20 Cr. 603 (PKC), 2022 WL 336975, at *1 (S.D.N.Y. Feb. 4, 2022) (quoting *United States v. Anderson*, 747 F.3d 51, 60 (2d Cir. 2014)). The court "must 'defer to the jury's evaluation of the credibility of witnesses, its choices between permissible inferences, and its assessment of the weight of the evidence.'" *Id.* (quoting *United States v. Jones*, 482 F.3d 60, 68 (2d Cir. 2006)). A conviction must be upheld "if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Peters*, 843 F. App'x 369, 372 (2d Cir. 2021); *see also United States v. Cuti*, 720 F.3d 453, 461 (2d Cir. 2013) ("A judgment of acquittal can be entered only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.").

---

[1] Unless otherwise noted, case text quotations omit all internal quotation marks, citations, and alterations.

## B. Discussion

The Government presented overwhelming—and certainly sufficient—evidence that the defendant made the Threat Call from his landline phone at 7:38 p.m. First, the defendant's claim that Krasniqi was unsure about the timing of the Threat Call is contradicted by the evidence. Approximately 13 minutes after the defendant's last call to NeueHouse, from his own home phone number at 7:51 p.m., Krasniqi called 911 to report that he received an anonymous call about an alleged shooter in NeueHouse who was going to "shoot up the place, quote un-quote." (GX 902; GX 701). During the 911 call, Krasniqi twice confirmed that he had received the call approximately ten minutes earlier. (GX 701 ("This happened approximately ten minutes ago."); *id.* ("This call was made about ten minutes ago. Maybe less.")). Krasniqi explained that he had "been acting as quick as [he] can about it" and with "urgency to try and prevent anything." (*Id.*). Indeed, Krasniqi testified that it felt like minutes passed between him receiving the Threat Call and him calling 911. (Tr. 208). Finally, Krasniqi explained on the 911 call that he had the "caller ID as well as the phone number," and that he could "speak to the police about that." (GX 701). Krasniqi testified that he indeed spoke to the NYPD upon their arrival at NeueHouse and showed them the call log. (Tr. 211). An NYPD phone number called Russell's landline phone four times between 8:10 p.m. and 8:11 p.m., thus confirming that Krasniqi had identified to the NYPD Russell's landline as the phone number used to call in the threat. (GX 902; GX 309).

Second, the defendant's contention that the Government "offered no evidence" that it was the defendant's voice that Krasniqi heard on the Threat Call was considered and rejected by the jury and again fails here. (Def. Mot. at 6). In particular, he claims that Krasniqi's description of the voice of the individual who made the Threat Call did not match the voice of the individual who

made the cease and desist call earlier in the night, which the defendant concedes was him. (*Id.*).

The defendant's attempt to use voice comparisons as a basis for the relief he seeks is flawed. As an initial matter, there is no requirement that the Government prove its case by any particular method, such as by voice comparison. The question is whether the proof that the Government did offer was sufficient to permit a rational jury to convict. Here, it plainly was. The defendant conveniently ignores the NeueHouse phone records that make crystal clear that the defendant placed the Threat Call. (GX 302). In the thirteen minute period before Krasniqi called 911 at 7:51 p.m., NeueHouse did not receive any other phone calls. (*Id.*). Moreover, the evidence showed that between 7:01 p.m. and 7:51 p.m., the defendant was the *only* person calling NeueHouse. (*Id.*; GX 902). There were no other callers during that time. The evidence also showed that after the 7:38 p.m. call to NeueHouse, the defendant stopped trying to contact NeueHouse. (GX 902). After calling NeueHouse nine times that night, it was only after the 7:38 p.m. call that he made to NeueHouse that the defendant instructed Jones to delete text messages and stopped his efforts to sabotage the Screening. (GX 902).

The "different voices" argument is a red herring: The defendant spent the day of December 4, 2018 pretending to be other people. Indeed, on the cease and desist call, the defendant purported to be someone else, a lawyer named Brian Nix. (Tr. 204-206; GX 1203). And earlier that day, as noted above, the defendant had pretended to be R. Kelly's lead investigator, Colon Dunn. The jury could have rationally concluded that the defendant, consistent with his use of disguise that day, did not use his regular speaking voice to commit a federal crime. The defendant focuses on the differences between the voice descriptions provided by Krasniqi, but Krasniqi could not, of

8

course, identify the voice of the defendant—a person he has never met (Tr. 221-22)—as the voice that made the Threat Call.

Finally, the defendant's arguments that the Government's "evidence regarding the landline used to make the threat call is inconclusive" was again rejected by the jury and is without merit. (Def. Mot. at 7). The defendant ignores the conclusive evidence establishing that Krasniqi called 911 at 7:51 p.m., that Krasniqi estimated receiving the Threat Call approximately ten minutes earlier, and that the only individual who called NeueHouse in the 50 minutes preceding the 911 call was the defendant. In the face of this evidence, the defendant argues that his own landline phone "appeared to be a fax number." (*Id.*). The evidence at trial established that the defendant used his landline to make and receive phone calls, including the call he made to NeueHouse at 7:38 p.m. Indeed, the parties stipulated that the landline phone number was a "telephone number[] . . . used by" Donnell Russell in "2018 and 2019." (GX 801). And the defendant had a 6-minute call with Jones on his landline phone on the *morning* of December 4, 2018. (GX 902; GX 307; GX 301; *see also* Tr. 382-83). Further still, the defendant listed his landline phone as an alternative number to his cellphone on the company invoice he prepared for services provided to R. Kelly. (GX 1408A). All of this evidence established that the defendant used his landline to make and receive phone calls and that he made the Threat Call on December 4, 2018.

In short, there is ample evidence establishing that the defendant made the Threat Call: the phone records that make clear that the defendant was the only person calling NeueHouse between 7:01 p.m. and 7:51 p.m. (GX 302); Krasniqi's 911 call where he reported receiving the Threat Call approximately ten minutes earlier (GX 701); the stipulation that the defendant was the individual

using the landline phone that was used to place the Threat Call (GX 801); the undisputed evidence of the defendant's motivation to stop the Screening; the defendant's advance knowledge that the police "maybe [sic] arriving shortly" at NeueHouse (GX 403); and the defendant's deletion of text messages about the police arriving at NeueHouse (*id.*). Based on Krasniqi's testimony and this documentary evidence, and the reasonable inferences from this evidence, a rational jury easily could have (and did) find the defendant guilty on Count Two.

## II.     The Court Should Deny the Defendant's Motion for A New Trial Under Rule 33

The defendant next requests relief granted in only the most extraordinary circumstances: a new trial under Rule 33. He claims that such relief is warranted because the Court admitted redacted versions of the PowerPoint presentations that the defendant sent to Lifetime and Drea Kelly as part of his effort to stop the Screening and the docuseries from proceeding. (Def. Mot. at 7-9). The Court, after careful consideration of the defendant's arguments regarding these exhibits, properly admitted these exhibits. Moreover, redacted versions of these exhibits, which defense counsel reviewed, prevented the alleged prejudice that the defendant now claims. For the reasons set forth below, the defendant's motion for a new trial under Rule 33 lacks merit, and should be denied.

### A.  Legal Standard

Rule 33 provides, in relevant part, that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "The defendant bears the burden of proving that he is entitled to a new trial under Rule 33[.]" *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009). Because motions for a new trial are strongly disfavored, "the standard for granting such a motion is strict," *United States v.*

*Gambino*, 59 F.3d 353, 364 (2d Cir. 1995), and it should be granted "sparingly and in the most extraordinary circumstances, and only in order to avert a perceived miscarriage of justice." *United States v. Gramins*, 939 F.3d 429, 444 (2d Cir. 2019). In deciding the motion, courts "should generally defer to the jury's resolution of conflicting evidence and assessment of witness credibility." *United States v. Landesman*, 17 F.4th 298, 330 (2d Cir. 2021). The "ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." *Peters*, 843 F. App'x at 374 (quoting *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001)).

**B. Discussion**

First, the defendant contends that the Court improperly admitted Government Exhibits 1409A, 1502B, 1512B, 1312, 1422, and 1403. (Def. Mot. at 8). However, consistent with the Court's pretrial rulings, the Government did not offer (and the Court did not admit) Government Exhibits 1502B or 1512B. These exhibits were threatening communications that the defendant made from the Colon Dunn email account that post-dated December 4, 2018. Moreover, Government Exhibits 1312, 1422, and 1403 are not PowerPoint presentations. As to Government Exhibit 1312, the Court agreed with defense counsel's objections and the Government redacted everything on the exhibit except for the items showing that the defendant created the "Colon Dunn" Yahoo user account on December 4, 2018. (GX 1312; Tr. 30-37). Similarly, Government Exhibit 1422 is a version of the cease and desist communication that the defendant emailed to Kash Jones. The Government, consistent with the Court's rulings, redacted references to R. Kelly's alleged conduct from that email and counsel did not raise any additional objections to that exhibit. (GX 1422). Government Exhibit 1403 is an email chain in which the defendant organized an appearance for R. Kelly at a fundraiser. Again, the Government made redactions to this exhibit

11

and defense counsel did not raise any specific objection to the unredacted material. Accordingly, the defendant's arguments related to the admitted PowerPoint exhibits are inapposite as to Government Exhibits 1502B and 1512B (which were not admitted) and 1312, 1422, and 1403 (which were not PowerPoint presentations, and which were redacted in a manner that rendered them unobjectionable to the defense during trial). Accordingly, the defendant appears to challenge only the admission of Government Exhibit 1409A.

Second, the defendant baselessly claims that the only PowerPoint presentation he challenges (GX 1409A)[2] "improperly swayed the jury to believe the government's allegation that Mr. Russell was R. Kelly's manager." (Def. Mot. at 8-9). The defendant ignores the public interviews he gave in which he held himself out as R. Kelly's manager. For instance, in one public interview, the defendant explained that he had connected with Kash Jones because "word had come out that Don Russell had took over the management of R. Kelly, and his brand." (GX 704; GX 803). Similarly, in another interview, which was titled "Live interview with Don Russell his Current manager / advisor," the defendant explained his role in helping R. Kelly arrange concerts. (GX 702; GX 803). The admitted PowerPoint presentations did not "improperly sway[] the jury"

---

[2] As noted in the Government's July 18, 2022 letter to the Court, Government Exhibit 1409A appears to be the same PowerPoint presentation in Government Exhibits 1410A, 1418A, and 1505B, which the defendant circulated at different times to different people. (Dkt. 67 at 1). Government Exhibits 1410A and 1418A, like Government Exhibit 1409A, were circulated on December 4, 2018. And the defendant sent Government Exhibit 1505B using his "Colon Dunn" email account, thus proving his identity as the user of that account (which was the same account that sent the PowerPoint Presentation to Lifetime executives on December 4, 2018). The exhibits were admitted with agreed-upon redactions, as described below.

to find that the defendant was R. Kelly's manager. The defendant's own words and actions established his role as R. Kelly's manager.

Third, the defendant rehashes his arguments to the Court about why the PowerPoint exhibit he challenges (GX 1409A) was irrelevant, unduly prejudicial, and inadmissible under Rule 404(b). The Court correctly found that this PowerPoint exhibit—which the defendant sent to Kash Jones, Lifetime executives, and Drea Kelly on the day of the Screening to undermine the credibility of the victims who were participating in the docuseries and the Screening—was relevant to the defendant's intent in making the Threat Call that night and his identity as the person who made the Threat Call. (July 19, 2022 VD Tr. 7).[3]

As the Court found, the Government had to prove that the defendant made the Threat Call. Accordingly, the Government was "entitled to prove that [the defendant], at the same time, [was] taking steps to otherwise undermine the screening, undermine and disrupt the screening, by these alleged attacks on credibility of the victims who were expected to speak at the screening." (*Id.* at 7). The PowerPoint presentation (*e.g.*, GX 1409A) therefore reflected "an escalating effort to disrupt the screening of the documentary" that was "extremely important evidence for the jury to understand." (*Id.* at 17). Ultimately, the Court held that the exhibit was "extremely probative on the issue of the defendant's intent, and the jury could find it shows escalating efforts on his part to disrupt the screening, which the government will contend ultimately culminated in the criminal threat of physical injury." (*Id.* at 18).

---

[3] "July 19, 2022 VD Tr." refers to the morning transcript before jury selection continued and "July 19, 2022 Tr." refers to the afternoon transcript after jury selection was completed.

Moreover, the Court and the parties took great care to "identify what portions of this material . . . are . . . unfairly prejudicial" so that the Court could do the Rule 403 "balancing check." (*Id.* at 11-12). Indeed, on the afternoon of July 19, 2022, the parties and the Court addressed each specific objection that defense counsel had to Government Exhibit 1409A, considered the Government's proposed redactions, and made specific rulings about additional redactions to eliminate any potential prejudice. (July 19, 2022 Tr. 20-30). The Court again made these determinations after finding that this PowerPoint exhibit was especially probative because "[w]e're talking about events that took place all in the same day as part of a concerted effort to stop the screening from happening." (*Id.* at 27). Following the Court's rulings on these specific objections, the Government and defense counsel agreed on additional redactions to the PowerPoint exhibit before it was admitted. (Tr. 45).

Defense counsel fails to identify any potential lingering prejudice from the redacted exhibit that was admitted, let alone any prejudice that outweighed the highly probative value of this exhibit that would render the outcome of this trial a "manifest injustice." Accordingly, the defendant's arguments are without merit.

**CONCLUSION**

For the reasons set forth above, the Government respectfully submits that the Court should

deny the defendant's post-trial motions.

Dated: August 19, 2022
      New York, New York

                                  Respectfully submitted,

                                  DAMIAN WILLIAMS
                                  United States Attorney for the
                                  Southern District of New York

By:        s/
                                    Peter J. Davis
                                    Lara Pomerantz
                                    Assistant United States Attorneys